

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-14-00399-CV

In the Interest of **D. M.**, A Child,

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-PA-02386
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Karen Angelini, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:        Karen Angelini, Justice
                Rebeca C. Martinez, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed: November 24, 2014

AFFIRMED

Emma[1] appeals the trial court's order terminating her parental rights to her son, D.M. In three issues, Emma contends the evidence was legally and factually insufficient to support the trial court's statutory endangerment and best interest findings. Because we conclude the evidence was legally and factually sufficient to support the trial court's findings, we affirm.

---

[1]To protect the mother's and child's privacy, we refer to the mother as Emma, a fictitious name, and the child by his initials. *See* TEX. FAM. CODE ANN. §109.002(d) (West 2014).

**THE TESTIMONY AT TRIAL**

Sheila Mueller, a San Antonio Police Officer, testified that on September 29, 2012, she and another police officer, Officer Sandoval, were dispatched to an apartment for an assault in progress. Two days earlier Officer Mueller had responded to a similar call at the same apartment. Upon arriving at the apartment, the officers saw a small child looking out of a broken window on the second floor. The child was screaming. Fearing the child would fall from the window, the officers hurried to the apartment door. The doorframe had been kicked in. The officers later learned that the apartment's residents had been evicted and no one was supposed to be in the apartment.

Officer Mueller banged on the apartment door and a man answered. The man said he had been sleeping and fleas had been biting him. He said he did not know where the apartment's residents were. The officers went inside the apartment and saw that it was filthy and disgusting, with trash everywhere. Broken glass was all over the floor. Below the window were syringes. The officers spotted the child, who now had a piece of broken glass in his hand and was playing with it. The child had cuts on his hands and feet from the glass. There was no food in the apartment other than moldy bread. The child appeared to be hungry. The child was wearing shorts and a t-shirt, but was without shoes or a diaper or underwear.

The man who answered the door was not the child's father, and he was in a hurry to leave. The man told the officers the child was D.M. The officers were able to determine that the mother of the child was Emma. They were also able to identify the father. It appeared to Officer Mueller that the man who answered the door had used drugs or illegal substances, and she was concerned about him being in the apartment with D.M. The officers called Child Protective Services ("CPS").

About an hour and a half later, Emma showed up at the apartment. Emma told the officers she had been assaulted by D.M.'s father and she had gone to the Drury Inn. Officer Sandoval took

D.M. to the children's shelter, and Emma was arrested for child endangerment. Officer Mueller learned that Emma was on bond for "[c]ontrolled substance, penalty grade 1."

Officer Mueller further testified that she called CPS because of the condition of the apartment, because D.M. was playing with glass shards, and because nobody was taking care of him. Officer Mueller determined D.M.'s birthday was October 13, 2010, so he was less than two years old at the time. She also learned that the child's father had a recent arrest and conviction for felony assault. Officer Mueller believed that D.M. was left in conditions with surroundings that endangered him. And, further, D.M. was directly harmed by this environment because of his cuts.

Nadia Henry, a CPS investigator, testified she first became involved in this case in September 2012. Henry went to the apartment shortly after the officers found D.M. When Henry arrived, she saw that D.M.'s face was dirty, he was not wearing a diaper or underwear, he had scratches on his arms, and he had small red marks on his legs that looked like insect bites. Clothing, animal feces, and broken glass littered the floor. The apartment was infested with fleas. The conditions were unsanitary and hazardous to D.M. Henry learned that Emma, D.M.'s father, and D.M. had been living in the apartment, even though they had been evicted.

Henry spoke with Emma at the magistrate's office shortly after D.M.'s removal. Emma admitted she had left the apartment earlier that day, leaving D.M. there with a man named Thomas. Emma told Henry about her child protective services history with her two older children in California. Emma did not tell Henry about previous CPS investigations involving D.M., both of which involved reports that D.M. had been left alone in a stroller outside of Emma's apartment. The previous cases involving D.M. had been investigated by CPS and closed. Emma also told Henry that she had not used drugs in five years. However, Henry further testified that, after this

case was filed, Emma underwent court-ordered drug testing and tested positive for methamphetamines and amphetamines.

Henry understood that Thomas, the man in the apartment with D.M. on the day of his removal, was a family friend. Henry had seen Thomas at an earlier court hearing in this case. Henry stated that she had concerns about Thomas, who had a drug history. Henry believed Emma had knowingly placed or allowed D.M. to remain in conditions that would endanger his physical or emotional well-being and had engaged in conduct or knowingly placed D.M. with persons who engaged in conduct that endangered his physical or emotional well-being. Henry also believed Emma had used a controlled substance in a manner that endangered D.M.'s health and safety.

John Cottle, a CPS caseworker, testified that D.M. was placed with a foster family following his removal. By the time of trial, D.M. had been living with this foster family for almost a year and a half, which was about half of his life. Cottle acknowledged that Emma had completed her service plan and graduated from criminal drug court. Cottle pointed out, however, that Emma had been incarcerated for part of the time this case was pending. And, Cottle expressed concern that Emma could not maintain her sobriety without the oversight provided by the drug court and probation. Cottle noted that people with a long history of drug abuse have a great chance of relapse, and that this was a very real concern in this case. Emma also had a long history with child protective services, both in California and Texas. For these reasons, Cottle believed it was in D.M.'s best interest to terminate Emma's parental rights.

Cottle also testified that D.M. was malnourished and speech-delayed when he was removed from Emma's care. However, while in the care of his foster family, D.M. showed significant improvements both physically and socially. D.M. no longer had a speech delay and communicated in English and in Spanish. Cottle had observed the interactions between D.M. and the foster family

and believed that D.M. had bonded with his foster family. Cottle stated that D.M.'s foster family would like to adopt him.

Patrick Vargas, a clinical director at Elite Counseling, testified that he was Emma's drug counselor. Vargas had experience with individuals with drug addictions. Vargas acknowledged that a recovering addict lives a life of recovery. According to Vargas, Emma has been successful, graduating from felony drug court. Vargas further stated that Emma has followed through with all requested of her and has been able to maintain a residence and employment. Vargas felt confident that Emma would be able to sustain her success.

Three witnesses testified on behalf of D.M.'s foster parents. According to this testimony, when D.M. first came to live with his foster parents in October 2012, he had a cut on his foot, scratches on his arms, and was very thin. D.M. was reserved and quiet and fearful of men. D.M. failed to make eye contact with others and lacked emotion and enthusiasm, even for activities like going to the park or playing with toys. D.M. ate constantly. After a year and a half in the care of his foster parents, the improvement in D.M.'s appearance and demeanor was dramatic. D.M. was no longer thin; he looked healthy. His demeanor was joyful, fun, silly, talkative, and happy. D.M. interacted with his foster parents and their friends and family, and he appeared to be very comfortable in his surroundings. And, his foster parents were in the final stages of adopting a little girl, with whom D.M. had bonded. Each of these witnesses testified that it would not be in D.M.'s best interest for him to be removed from his foster parents.

In her testimony, Emma admitted that on the day of D.M.'s removal, D.M. was in conditions that were really bad for him. Emma agreed that the syringes, the broken glass, and the feces were not appropriate for D.M. She also admitted she had left D.M. in the apartment knowing about these conditions. Emma contended that she was challenging her eviction from the apartment

in court. Emma also admitted there were several instances of family violence by D.M.'s father. Additionally, about five weeks before D.M.'s removal, Emma was arrested for shoplifting and possession of methamphetamines and a methamphetamine pipe. She was later convicted of these offenses. Emma agreed that all of these factors were terrible for D.M.

Emma stated that Thomas, the man with whom she had left D.M. on the day of his removal, was her friend. Emma knew Thomas had served time in prison and, although she did not know the underlying offense, she would not have been surprised if it was drug-related. Even so, Emma had allowed Thomas to have access to her child.

Emma had had a six-year relationship with D.M.'s father and, during that period, she was aware of his criminal history. D.M.'s father had assaulted her three to four times, but only once in D.M.'s presence. When D.M.'s father assaulted Emma in August 2012, she made a police report, and indicated that the assaults were becoming more frequent and that D.M.'s father had hit D.M. Even after making that report, however, Emma still allowed D.M. to be around his father. Emma nevertheless stated that D.M's father would not return to her home when he is released from prison in the future.

Emma further testified that she had been a drug addict most of her life, since she was twenty-one years old. Her drug of choice was methamphetamines. She was forty-four at the time of trial. Emma admitted she had been incarcerated thirty-one times for a variety of offenses, including theft, drug possession, vehicle theft, and credit card crimes in both California and Texas. She was also incarcerated in California for three years for possession of brass knuckles. During the pendency of this case, Emma was first incarcerated and then in drug treatment. At the time of trial, Emma had been released from drug treatment for seven months.

According to Emma, she had made three prior attempts at drug rehabilitation. Each time she had relapsed. Emma admitted that she had chosen drugs over her child because she had an addiction, but stated she has "turned [her] life around" and has "been clean and sober for almost one year." Emma recognized that she is still an addict and will continue to be for the rest of her life; however, she pointed out that she is older now and claimed that she has lost the desire to use drugs. Emma emphasized that she has done everything required by CPS and more. Emma indicated that she works on drug treatment daily and attends multiple meetings per week; she is engaged in her recovery as never before. Emma stated she has matured and feels she can maintain her sobriety forever. Emma believes she can take care of D.M. Emma further testified that when D.M. was born she had contact with a CPS caseworker. Emma told this caseworker that she had been in drug treatment previously, had given up that lifestyle, and would never use drugs again. Emma also testified she has two other children, ages 12 and 17, who live in Hawaii with her brother. Emma acknowledged that her older children had not lived with her for the past seven years, but claimed her drug use was not the reason.

When asked about her visits with D.M., Emma stated that he is upset at the end of every visit and wants to stay with her. Emma acknowledged that removing D.M. from his foster home would be traumatic for him, but she felt that adoption would be traumatic for him as well. Furthermore, Emma stated that children adjust easily to change and she would take D.M. to therapy to help him cope with the adjustment. Emma emphasized that she has been clean and sober for over sixteen months and has had a job and a residence for eight months. Finally, Emma stated she believes that it is in D.M.'s best interest for him to be returned to her because she is his mother, she has done everything required, and she is now stable and secure.

At the close of the testimony, the attorney ad litem, the foster parents' attorney, and the Department's attorney recommended termination. The Department alternatively recommended post-termination contact for Emma. The trial court rendered an order terminating Emma's parental rights. The order also terminated D.M.'s father's parental rights, but he has not appealed. The termination order also stated that the foster parents, who intervened in this case, have standing to adopt D.M.

## STANDARD OF REVIEW

Parental rights may be terminated only upon proof by clear and convincing evidence that the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. TEX. FAM. CODE. ANN. §161.001(1), (2) (West 2014); *In the Interest of J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE. ANN. §101.007 (West 2014); *see J.O.A.*, 283 S.W.3d at 344. This heightened standard is required because termination results in permanent and unalterable changes for both parent and child, implicating due process. *In the Interest of E.A.G.*, 373 S.W.3d 129, 140 (Tex. App.—San Antonio 2012, pet. denied). This standard requires the reviewing court to ask whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven and that the termination was in the best interest of the child. *In the Interest of J.P.B.*, 180 S.W.3d 570, 573-74 (Tex. 2005).

In reviewing legal sufficiency of the evidence in termination cases, we view the evidence in the light most favorable to the trial court's findings and judgment. *Id.* at 573. Disputed facts, if any, are resolved in favor of the trial court's findings, if a reasonable factfinder could have so

resolved such facts. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved. *Id*. And, we are to consider undisputed evidence even if it is contrary to the trial court's findings. *Id*. In other words, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id*. We do not weigh credibility issues that depend on the appearance and demeanor of witnesses; credibility issues are within the province of the factfinder. *Id*. Even when credibility issues appear in the record, we are to defer to the trier of fact's determinations as long as they are not unreasonable. *Id*.

In reviewing for factual sufficiency, we give due deference to the factfinder's findings; the reviewing court must refrain from substituting its judgment for that of the factfinder. *In the Interest of H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). If, in light of the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor of the finding is so significant that a trier of fact could not reasonably have formed a firm belief or conviction in the truth of the finding, then the evidence is factually insufficient. *Id*.

### STATUTORY ENDANGERMENT FINDINGS

Emma first contends the evidence was legally and factually insufficient to support termination pursuant to subsections 161. 001(1)(D) and (E) of the Texas Family Code.

Section 161.001(1)(D) provides for parental termination if the court finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Section 161.001(1)(E) provides for parental termination if the court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with

persons who engaged in conduct which endangers the physical or emotional well-being of the child."

The evidence, as detailed above, is sufficient for the court to have found Emma engaged in acts or omissions pursuant to subsections 161.001(1)(D) and (E). Notably, Emma admitted that she had knowingly left D.M. in conditions that were bad for him, which included syringes, broken glass, and feces in the apartment. And, she knew the man she left D.M. alone with in the apartment had a criminal history. The police officer and CPS investigator confirmed that Emma had left D.M. in a dangerous situation. D.M. was playing with broken glass and had cuts on his hands and feet. He was in an apartment from which his parents had been evicted. And, D.M. appeared to be hungry but there was no food in the house. Further, he was not wearing shoes or a diaper. According to the police officer, the man D.M. had been left with was sleeping and had flea bites. The CPS investigator was concerned about the man's drug history. And, according to the CPS investigator, D.M. also had flea bites on his legs. Emma also admitted D.M. had been present on one of the several occasions that D.M.'s father had assaulted her. And, she admitted to her own criminal history and drug addiction.

Thus, the evidence shows Emma had knowingly left D.M. in unsanitary and dangerous conditions. *See In the Interest of C.L.C.*, 119 S.W.3d 382, 392-93 (Tex. App.—Tyler 2003, no pet.) (finding unsanitary conditions can qualify as surroundings that endanger a child). Further, the evidence shows Emma exposed D.M. to family violence and illegal drug use. *See In the Interest of J.T.G.*, 121 S.W.3d 117, 125-127 (Tex. App.—Fort Worth 2003, no pet.) (stating that abusive or violent conduct in the home and parental illegal drug use and drug-related criminal activity supports conclusion of child endangerment). We conclude the evidence is legally and factually sufficient to support the trial court's statutory endangerment findings.

**BEST INTEREST FINDING**

Emma next contends the evidence was legally and factually insufficient to support the trial court's finding that termination was in the best interest of the child. When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. §263.307(a) (West 2014).

In determining the best interest of the child, we may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (4) the programs available to assist these individuals to promote the best interest of the child; (5) the plans for the child by these individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive. *In the Interest of C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id*. In analyzing these factors, we focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dept. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Further, the same evidence proving acts or omissions under section 161.001(1) of the Texas Family Code may be probative of best interest of the child. *In the Interest of C.H.*, 89 S.W.3d at 28. A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In the Interest of B.K.D*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied).

Turning to the evidence regarding the best interest of the child, we consider the *Holley* factors as outlined above.

### *Desires of the Child*

As to the first factor, D.M.'s desires, there was no evidence because he was too young to express his desires. *See In the Interest of A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("The young age of the child render[s] consideration of the child's desires neutral.")

### *Physical and Emotional Needs*

With regard to the second factor, D.M.'s emotional and physical needs now and in the future, the evidence showed that D.M.'s physical and emotional needs were being met with his foster family. The evidence also showed that when D.M. was first removed from Emma's care and came into the foster home, D.M. was malnourished, quiet, shy, and would not stop eating. After D.M. had been in the care of his foster family for approximately a year and a half, D.M. was healthy, happy, and well-adjusted. Emma's testimony indicated that she believed she could meet D.M.'s needs in the future, although she did agree that D.M.'s removal from his foster family would be traumatic for him. Emma said she planned to take D.M. to therapy to help him make this adjustment. Despite Emma's testimony, however, the trial court could have inferred from Emma's past inability to meet D.M.'s physical and emotional needs, an inability to meet D.M.'s physical

and emotional needs in the future. *See In the Interest of J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A factfinder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future."); *Castorena v. Tex. Dept. of Protective & Regulatory Services*, No. 03-02-00653-CV, 2004 WL 903906, at *11 (Tex. App.—Austin 2004, no pet.) (noting that the trial court could properly infer that parents' history of instability and criminal conduct, which had previously endangered the children, might recur if the children were returned to them).

### *Emotional and Physical Danger*

As to the third factor, the emotional and physical danger to D.M. now and in the future, the evidence showed there was no risk of emotional and physical danger to D.M. while in the care of his foster family. For her part, Emma testified that she has lost her desire to use drugs, is working on drug treatment, and is engaged in her recovery as she has never been before. But even Emma acknowledged that a relapse was possible. Emma's drug counselor testified that Emma was a recovering addict, that she had been successful, and that he was confident she would continue to be so. Despite this testimony, however, the trial court could also consider the evidence showing that in the past Emma had engaged in behaviors that had placed D.M. in emotional and physical danger. The evidence showed that Emma had been a drug addict for most of her life, had been incarcerated thirty-one times, had been in drug rehabilitation three times in the past and had relapsed each time, and was serving a five-year probationary sentence. The evidence also showed that—even after D.M.'s removal—Emma tested positive for amphetamines and methamphetamines. A fact finder in a termination case may permissibly infer that a parent's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation. *Castorena*, 2004 WL 093906, at *10.

### *Parental Abilities*

Regarding the fourth factor, the parental abilities of those seeking custody, the evidence again reflected favorably on D.M.'s foster parents' abilities to parent him. The evidence showed there was mutual love and a strong bond between D.M. and his foster parents. Emma testified that D.M. was upset at the end of their visits and wanted to stay with her. Emma also testified that she had done everything that CPS and the drug court had required. Although Emma stated she believed she could take care of D.M., she nevertheless had a history of not adequately caring for him that the factfinder could take into account in evaluating her parental abilities. "A fact finder may measure a parent's future conduct by her past conduct and determine that it is in a child's best interest to terminate her parental rights." *Id*.

### *Programs Available*

No evidence was adduced regarding the fifth factor, programs available to assist those seeking custody of D.M.

### *Plans for the Child*

As to the sixth factor, plans for the child, the evidence showed the foster family intended to adopt D.M., along with another child placed in their home with whom D.M. had bonded. Emma testified that she has "turned [her] life around" and believes she can now take care of D.M. Emma also said that D.M.'s father would not return to her home when he is released from prison. However, a trial court is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions. *Id*., at *11.

### *Stability of the Home*

Regarding the seventh factor, stability of the home, Emma testified she had been "clean and sober for 16 months and 10 days" and she had "had a job and [maintained] a residence for

eight months." The stability of the proposed home environment is an important consideration in determining whether termination is in the child's best interest. *J.D.*, 436 S.W.3d at 120. "Children require secure, stable, long-term, continuous relationships with their parents or foster parents." *Castorena*, 2004 WL 093906, at *10. "Stability and permanence are paramount in the upbringing of children." *J.D.*, 436 S.W.3d at 120. In this case, any stability Emma could provide for D.M. was tied in large part to her sobriety. However, as even Emma's drug counselor acknowledged, no one could guarantee that Emma would maintain her sobriety. On the other hand, the evidence showed that D.M.'s foster family was providing and could continue to provide D.M. with a stable, permanent home.

### *Parental Acts or Omissions/Excuses*

The eighth factor concerns the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and the ninth factor concerns any excuse for the parent's acts or omissions. Again, although Emma testified she had turned her life around and believed she could take care of D.M., she admitted that for the first half of D.M.'s life, she had chosen drugs over D.M. Moreover, Emma admitted that she had been incarcerated thirty-one times and that she was presently serving a five-year probationary sentence. She was also involved in an abusive relationship with D.M.'s father and exercised extremely poor judgment by leaving D.M. in dangerous and deplorable conditions. Although Emma's very recent success was commendable, the trial court certainly could have found that Emma's acts and omissions in the not too distant past showed that her relationship with D.M. was not a proper one.

In her brief, Emma does not challenge the evidence as it relates to each *Holley* factor but rather argues that the Department did not adduce credible evidence "on even half of the *Holley* factors." We note, however, that the Department was not required to present evidence on all of the

*Holley* factors. *C.H.*, 89 S.W.3d at 27. In some circumstances, evidence of even one *Holley* factor may be sufficient. *Jordan v. Dossey*, 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Emma also argues that the Department seemed to advance the improper argument that the foster family was "essentially a better family." It is true that "[t]ermination should not be used to merely reallocate children to better and more prosperous parents." *In the Interest of D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). However, the facts in this case support the trial court's finding of best interest based on more than merely the foster family being a more desirable family for D.M. The evidence for the trial court to consider consisted of D.M.'s exposure, while being cared for by Emma, to illegal drug use, criminal activity and incarceration, domestic violence, and emotional and physical endangerment. And, although Emma testified that she had no desire to use drugs in the future and she believed she could take care of D.M., we defer to the trial court on issues of credibility.

Emma also argues that it is not *yet* in D.M.'s best interest for her parental rights to be terminated because she completed every task that was asked of her, she is "on a successful recovery track" and "this case has just started with regard to [her]." Thus, it appears Emma is arguing that she is automatically entitled to return of D.M. because she completed all services requested of her and that she has not yet had enough time for the best interest determination to be made. Completion of all she was asked to do by CPS, however, does not necessarily mean termination is not in the child's best interest. *See In the Interest of M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (stating it is not always the case that compliance with a plan means termination cannot be in a child's best interest). Further, in addition to the State's fundamental interest in protecting the best interest of a child, the State also has an interest in a final decision on

termination so that adoption to a stable home or return to the parents is not unduly prolonged. *See In the Interest of M.S.*, 115 S.W.3d 534, 548 (Tex. 2003). "By requiring all termination suits to be completed within a year, the Legislature made clear that courts cannot leave children in foster homes indefinitely while existing parents try to improve themselves and their conditions." *M.G.D.*, 108 S.W.3d at 515.

The dissent recognizes that a parent's improvement in behavior does not totally offset instability and harmful behavior in the past, citing a number of cases that have so held. The dissent, however, distinguishes each of those cases from this case because those cases either contained evidence refuting the parent's claim of rehabilitation or some additional evidence in support of termination. *See id.* at 513-15; *Anderson v. Tex. Dep't of Family & Protective Servs.*, No. 03-06-00327-CV, 2007 WL 1372429, at *4-*5 (Tex. App.—Austin May 9, 2007, pet. denied); *In the Interest of A.H.*, No. 09-13-00395-CV, 2014 WL 1400771, at *5 (Tex. App.—Beaumont Apr. 10, 2014, no. pet.). While these cases are somewhat distinguishable, none specifically stands for the proposition that, in addition to evidence of the parent's improvement in behavior, there must be further evidence to contradict the parent's claim of rehabilitation such as continuing drug use after removal or other additional evidence such as failure to obtain housing or employment, to support termination based on best interest.

In fact, in a very recent case, *In the Interest of J.T.K.*, No. 12-13-00339-CV, 2014 WL 1093086 (Tex. App.—Tyler March 19, 2014, no pet.), termination was upheld on facts similar to this case. In that case, the mother testified that the evidence was insufficient to show termination was in her child's best interest because she completed the tasks on her service plan and there were problems for the child in his foster home. The Tyler court recognized that "compliance with a service plan does not preclude a finding that termination is in the child's best interest." *Id*. at *8

(citing *In the Interest of A.C.B.*, 198 S.W.3d 294, 298 (Tex. App.—Amarillo 2006, no pet.). The mother testified to a history of drug and alcohol abuse and removal of her older children because of her drug use. *Id.*, at *9. She also testified to a criminal history, including multiple driving while intoxicated and public intoxication charges. *Id.* However, the mother, much like Emma, also testified that "unlike the times before, she now has the tools she needs to stay sober, deal with stressful situations, and parent [the child]." *Id.* The evidence undisputedly showed she had been sober for a year and a half and had successfully graduated from a residential treatment facility. *Id.* She had additionally received grief and drug intervention counseling and had taken classes on relapse prevention, healthy coping, and self-improvement. *Id.* Further, she testified that she "'just sees things different now'" and she "'just want[s] the opportunity to prove that I can be a good mother to my son and that I can remain clean and sober.'" *Id.* Despite the mother's improvement in behavior, the court nevertheless found that the evidence was sufficient to support termination. Specifically, the court stated "we conclude that the evidence weighing against termination ([the mother's] sobriety) is not so significant to conclude that the fact finder's decision was unreasonable due to the termination of [the mother's] parental rights to her four oldest children, her history of substance abuse, and her criminal history involving intoxication offenses." *Id.*

Likewise, in the case herein, viewing the evidence in the light most favorable to the finding, the trial court could reasonably have formed a firm conviction that termination of Emma's parental rights was in D.M.'s best interest. Further, viewing the record as a whole, the trial court could reasonably have formed a firm conviction that termination of Emma's parental rights was in D.M.'s best interest. And, the evidence weighing against termination (Emma's sobriety and improvement in behavior) is not so significant to conclude that the trial court's decision was unreasonable due to Emma's history of drug abuse, criminal activity and incarceration, and

exposing D.M. to domestic violence. We conclude the evidence is legally and factually sufficient to support the trial court's finding that termination was in the best interest of the child.

## CONCLUSION

The trial court's termination order is affirmed.

Karen Angelini, Justice