

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-18-00727-CV

**IN THE INTEREST OF K.M.J.**

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-02187
Honorable Martha Tanner, Judge Presiding[1]

*consolidated with*

No. 04-18-00728-CV

**IN THE INTEREST OF A.N.J.**

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-02188
Honorable Martha Tanner, Judge Presiding

Opinion by:      Liza A. Rodriguez, Justice
Dissenting Opinion by: Patricia O. Alvarez, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Irene Rios, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: April 3, 2019

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

Appellant Father A.J. appeals the trial court's orders terminating his parental rights to his

ten-year-old daughter, K.M.J., and three-year-old daughter, A.N.J.[2]  We hold that the evidence is

---

[1] Sitting by assignment.
[2] The trial court also terminated the parental rights of D.R., the mother of K.M.J., and of K.G., the mother of A.N.J. Neither mother filed a notice of appeal.

factually insufficient to prove termination of Father's parental rights is in the best interests of the children and reverse the portions of the trial court's orders terminating his parental rights and remand the causes for further proceedings. Because Father does not challenge the trial court's conservatorship findings on appeal, we affirm the trial court's orders of termination in all other respects, including the portions of the orders appointing the Department of Family and Protective Services as sole managing conservator of the children.

BACKGROUND

The Department presented only one witness at the termination hearing on September 25, 2018. Jason Logsdon, the Department caseworker assigned to both cases, testified that the initial allegations which caused the Department to become involved were "drug use and/or drug dealing." Specifically, Logsdon stated that K.M.J. "made an outcry of finding a baggy of what was thought to be drugs" and a third child not involved in the case was found "with a rock in their hand, and it was believed to be a drug." However, he conceded that no testing was conducted to confirm that either item "thought" or "believed" to be a drug was in fact an illegal drug. No evidence was presented regarding the physical characteristics or type of drug(s) suspected or identifying who initially thought the items were illegal drugs and the basis for their belief. Additionally, Logsdon stated that Father and D.R., the mother of K.M.J., submitted to drug tests during the Department's investigation and the results were "concerning." Logsdon did not elaborate beyond that vague statement and did not specify which person's drug tests were "concerning," or whether the concern extended to both tests. No evidence was presented to show that the drug tests were in fact positive for drugs, or to explain what exactly gave rise to the "concern." Logsdon testified that removal of the children on September 28, 2017 was based on these allegations.[3]

---

[3] Logsdon also stated that Father was arrested "with the youngest child [A.N.J.] in the car" "in the middle of the night" during the Department's investigation. However, the record contains no information about the circumstances

Logsdon also testified that, prior to removal, the case was assigned to Family Based Services but "there were concerns that the parents were not working services." Again, Logsdon did not specify which of the three parents that concern extended to and what services the parent(s) failed to do. He did not provide any evidence of the services that were being provided to the parents or of the actions taken by the Department to ensure the children remained in the home with their parents.

Once Logsdon received the case after removal, he established a family service plan for the parents outlining the necessary steps to be taken to achieve reunification with the children. Father's plan required him to (1) undergo a drug and alcohol assessment, (2) submit to random drug testing, (3) participate in individual counseling, (4) participate in a parenting class, (5) participate in couples therapy with K.G., (6) undergo a psychological evaluation, (7) resolve any criminal charges, (8) maintain stable employment, (9) maintain stable housing, and (10) participate in visits with his daughters K.M.J. and A.N.J.

Father completed the drug and alcohol assessment and engaged in drug treatment, although there was some dispute as to when he began the drug treatment program "in earnest." Logsdon stated that, on the morning of trial, he confirmed the status of Father's current attendance at outpatient drug treatment at Elite Treatment Center, but he did not inquire which stages of the program Father had completed. Logsdon acknowledged that, based on the information provided to him, Father was attending treatment and was in compliance with the drug treatment.

On direct examination, Logsdon testified that Father submitted to a urinalysis in April 2018 which was negative, but failed to submit to urinalysis tests on at least seven other occasions, including failing to submit to a hair follicle exam in April, May and June. On cross-examination,

surrounding the arrest, the basis for the arrest, the date of the arrest, or the disposition, if any, of any charge arising from the arrest.

Logsdon added that he was aware of one random drug test given to Father during the Elite Treatment program; he did not state whether the test was positive or negative. In addition, Logsdon stated that Father was voluntarily attending Narcotics Anonymous classes on his own, outside the requirements of the service plan, and had provided Logsdon with copies of the sign-in sheets.

Father completed the psychological assessment. He attended individual therapy but was discharged for noncompliance in June 2018. Logsdon initially stated he did not recall whether Father asked him for a referral to a different therapist after the discharge, and agreed that a parent cannot be faulted for not completing a service if it was not set up by the Department. On re-direct, however, Logsdon changed his answer to reflect that he did in fact refer Father to a new therapist based on Father's request. One of the results of Father's psychological evaluation was a recommendation that Father have a psychiatric examination and a neurological examination. Logsdon testified that, although it was recommended, he did not refer Father to a doctor for the neurological exam because "that's a medical exam" and he did not know how to go about setting up a medical examination and did not think it was his responsibility to set up that type of service. Logsdon expressed his belief that Father could just get a referral from his primary physician; however, he did not know whether Father had health insurance or the cost of a neurological evaluation. Logsdon stated he did refer Father to the Center for Healthcare Services for the recommended psychiatric exam.

Father successfully completed the parenting class. As part of the service plan, Father was also ordered to participate in couples' therapy with K.G., the mother of A.N.J., but he did not complete that service. Logsdon stated he believed that Father and K.G. were still in a relationship because they shared a cell phone and showed up to services together. Logsdon also testified that he did not know any details about the nature of the relationship between Father and K.G. during the case and it was "not clear" whether they were a couple; he agreed that couples' therapy was

not needed if Father and K.G. were not currently in that type of relationship. K.G. testified[4] that they have an "open relationship" in which they each do what they want. K.G. acknowledged that Father provides her with shelter and helps her so they can continue being "Mom and Dad" to their daughter A.N.J. K.G. also testified that she asked Logsdon to refer her to a separate therapist because she did not want her private information shared with Father by the joint therapist; she stated Logsdon made the referral for her to have her own therapist.

Father provided proof of employment. Logsdon testified that Father provided an employment letter on his employer's letterhead but conceded he never called the employer to verify Father's employment. Logsdon stated that Father complied with that requirement of his service plan. In addition, Father had stable housing and Logsdon assessed the inside of the two-bedroom home and had "no major concerns." Father lived in the same house during the entire pendency of the case.

Father attended twenty-five visits with the children. He missed five visits and was late to other visits due to car trouble. Logsdon observed visits between Father and the children and found "no major issues" during the visits. Logsdon acknowledged the visits were appropriate and agreed "the Department has never expressed any concerns about those visits." Logsdon did not specify how many visits he observed. Father has maintained consistent contact with the Department during the case.

Logsdon testified that Father did not have any pending criminal charges against him that needed to be resolved under the service plan. However, when asked whether there were any new allegations made during the pendency of the case, Logsdon stated that "K.M.J. made an outcry of sexual abuse against [Father]" one month before the trial. According to Logsdon, when K.M.J.

---

[4] K.G. testified by phone from jail. The record is not clear when K.G. was incarcerated.

was interviewed at Child Safe, however, she "didn't say anything." Logsdon testified that he checked the status of the Department's investigation on the morning of trial and the Department's records showed it was still open. When asked whether he was aware that the Department's investigator had closed the case on the preceding Friday, Logsdon stated he was not aware of the investigation being closed or ruled-out. Logsdon testified that K.M.J had been attending the visits with Father, but after the outcry she "no longer wanted to visit" with Father. The record is not clear as to the source of this information concerning K.M.J.'s desires. The record is not clear whether Logsdon ever spoke to K.M.J. about her allegation; he did not state that he discussed it with her. Logsdon did testify he did not talk to Father about K.M.J.'s allegation and did not review K.M.J.'s interview at Child Safe. Logsdon conceded that the Department stopped bringing K.M.J. to visits with Father after her outcry despite a court ruling that K.M.J. "didn't get to opt out of a visit" with Father on her own.

Finally, Father presented the testimony of his adult son who stated that he has been to Father's home many times and it is a safe environment; he has never seen Father using or selling drugs; Father takes good care of K.M.J. and A.N.J. and "loves them a lot;" and he has not seen anything negative in their interactions. The son also testified that Father was not currently in a relationship, but had previously been in a relationship with K.G. The son only recently found out that K.M.J. and A.N.J. had been removed from Father's home by the Department and had been placed with his aunt.

At the conclusion of the hearing, the trial court found that Father had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of his children who had been in the Department's temporary or permanent managing conservatorship for not less than nine months as a result of their removal under Chapter 262. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The trial court further found that termination of

Father's parental rights to K.M.J. and A.N.J. was in the children's best interests. *Id.* § 161.001(b)(2). Father appealed.

On appeal, Father does not challenge the trial court's finding that he failed to comply with the family service plan in each case. *See id.* § 161.001(b)(1)(O). Father's sole issue on appeal is that the evidence is legally and factually insufficient to support the trial court's findings that termination of his parental rights is in each child's best interest. *See id.* § 161.001(b)(2).

## STANDARD OF REVIEW

A trial court may terminate an individual's parental rights, severing the parent-child relationship, only upon a showing by clear and convincing evidence that one or more statutory grounds for termination exists, and that termination is in the best interest of the child. *Id.* at § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. This heightened standard stems from the permanency and unalterable changes that termination of a parent-child relationship causes both the parent and child. *In re D.M.*, 452 S.W.3d 462, 469 (Tex. App.—San Antonio 2014, no pet.). The natural rights between a parent and their child are of constitutional dimension and termination of parental rights is "complete, final, and irrevocable." *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). Consequently, termination proceedings are strictly scrutinized and "involuntary termination statutes are strictly construed in favor of the parent." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012).

In reviewing legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate

deference, "a reviewing court must assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so." *Id*. Further, a reviewing court should disregard "all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. As such, a reviewing court considers "evidence favorable to termination if a reasonable factfinder could," and disregards "contrary evidence unless a reasonable factfinder could not." *In re D.M.*, 452 S.W.3d at 469. Evidence is legally insufficient if the reviewing court determines "no reasonable factfinder could form a belief or conviction that the matter that must be proven is true." *In re J.F.C.*, 96 S.W.3d at 266.

In determining factual sufficiency, we give deference to the factfinder's findings, but also consider and weigh the disputed and contrary evidence. *In re D.M.*, 452 S.W.3d at 469; *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). In other words, we give "due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In considering whether the evidence rises to the level of being "clear and convincing," we must determine whether the evidence is sufficient for the fact finder to reasonably form a firm belief or conviction as to the truth of the allegation sought to be established. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. In conducting a factual sufficiency review, we cannot substitute our judgment for that of the factfinder. *In re D.M.*, 452 S.W.3d at 469 (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)).

## BEST INTEREST

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). When the court considers factors related to the best interest of the child, however, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). In determining whether a parent is willing and able to provide the child with a safe environment, the court should consider the following statutory factors: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills;[5] and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b).

---

[5] This factor includes providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and

In addition, the court may also consider the nonexclusive factors enumerated in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976), in considering the best interest of the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The *Holley* factors include, but are not limited to: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d at 249 n.9; *Holley*, 544 S.W.2d at 371-72. The *Holley* factors are not all-encompassing and a court need not find evidence of each factor before terminating the parent-child relationship. *See In re C.H.*, 89 S.W.3d at 27.

Evidence establishing one or more statutory grounds for termination under section 161.001(b)(1) may also be considered as evidence showing that termination is in the child's best interest. *Id.* at 28 (holding same evidence may be probative of both statutory grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

---

psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities. TEX. FAM. CODE ANN. § 263.307(b).

*Analysis*

**A. Section 263.307(b) Factors**

K.M.J. was ten years old at the time of trial and A.N.J. was three years old. Logsdon testified that neither child has any special needs. There was no evidence of any psychiatric, psychological, or developmental examinations of the children. The Department had not been previously involved with Father and the children had no prior removals from his home. There was no evidence of any physical harm to the children inside the home. Father's home was evaluated and found to be adequate; the Department expressed no concerns about the safety of the home environment.

As discussed above, Father completed the psychological evaluation and attended individual counseling. After he was discharged by his initial therapist in June 2018, Father sought out a new referral from Logsdon for a new therapist, indicating his willingness to seek out and accept support by participating in counseling. Father completed the parenting classes required by his service plan and attended twenty-five visits with his children. Logsdon testified the visits were appropriate and he, and the Department as a whole, had no concerns about Father's interactions with the children during the visits. Father explained the missed visits to Logsdon by stating he had transportation problems. There was no evidence that Father had any criminal history, and Logsdon testified Father had no pending criminal charges that needed to be resolved under his service plan.

With respect to whether there was a history of substance abuse by Father, there was conflicting evidence presented by Logsdon and Father's adult son. Logsdon testified to vague and conclusory allegations of drugs being found inside the home and "concerns" about the drug tests given to Father and K.G. during the investigation phase of the cases. Specifically, Logsdon testified that the ten-year old child told someone (unnamed) that she found a baggy containing

what she *thought* was drugs, and another child was found holding a rock that was *believed* to be a drug. This testimony is merely evidence that illegal drugs *may* have been inside the house where Father and K.G. lived with the children. There was no evidence of any tests that positively confirmed the presence of illegal drugs in Father's house or in his body. Further, there was no evidence tying possession of the alleged drugs to Father, as opposed to D.R. or K.G., the mothers of K.M.J. and A.N.J., respectively. The evidence also did not specify the type of drug suspected, its location inside the house (common area or bedroom), or its quantity. As noted, K.G. was incarcerated during the case. During her testimony, she refused to state whether she was incarcerated for drug possession. Further, Father's son testified that he had never seen his father use drugs or sell drugs. There was no evidence that Father had a criminal history record. Indeed, Logsdon testified that Father had no pending criminal cases that needed to be resolved under the family service plan. Moreover, even though Father consistently denied using or selling drugs throughout the case, Logsdon admitted Father attended outpatient drug treatment in compliance with his service plan, tested negative on the urinalysis test that he submitted to, and voluntarily attended NA meetings outside his service plan.

With respect to whether there was a history of abusive conduct by Father, again there was mere conclusory testimony on the issue. Logsdon stated only that K.M.J. made an outcry of sexual abuse against Father one month before the termination hearing. There is no evidence of the factual circumstances comprising the sexual abuse claim—there is no information about the nature of the alleged sexual conduct, the number of times it purportedly occurred, the circumstances surrounding the outcry, or to whom the outcry was made. The only evidence in the record about the outcry is Logsdon's conclusory statement that the outcry was *made*. There is not even evidence about the source of Logsdon's information. Logsdon did not testify whether he spoke to K.M.J. about her allegation of sexual abuse. He did affirmatively testify he did not discuss the allegation

with Father and did not view the Child Safe interview in which K.M.J. "didn't say anything" about sexual abuse. Logsdon was unable to testify with any certainty as to whether the Department's investigation into the outcry was still pending or had been recently ruled-out. And, through its questioning and arguments at trial, the Department improperly attempted to shift the burden to Father to disprove the allegation of sexual abuse or to prove the investigation had been closed. Finally, while Logsdon testified to his understanding that K.M.J. no longer wanted to visit Father after the outcry, he later confirmed that despite a court order it was the Department that failed to bring her to those visits with Father.

### B. The Holley Factors

Logsdon testified that K.M.J. and A.N.J. have been placed together with their paternal aunt since March 2018. The placement is meeting all of the children's needs and they are enrolled in school. Logsdon testified that, when he first got the case, K.M.J. was refusing to eat and was admitted into Laurel Ridge for a period of time. She was then discharged and placed on medication. "Once she was placed with the aunt, she no longer has the issues with not eating or depression." She has a positive relationship with her paternal aunt and uncle and calls them "mom and dad;" that is "where she wants to be." Three-year-old A.N.J. is adjusting well to her new home and "is always happy" and likes to play. Logsdon's observation is that A.N.J. feels comfortable and safe there.[6] The Department's long-term plan for the children is for them to be adopted in the current placement. The record contains no evidence specific to the remaining *Holley* factors.

### C. Other Considerations

Logsdon testified that, in his opinion, Father has not made the necessary changes for the Department to feel comfortable returning the children to him and that termination of his parental

---

[6] During the time the children were placed with the paternal aunt, they continued to have regular visits with Father.

rights is in the children's best interest. In support of his opinion, he cited Father's failure to fully comply with his service plan—specifically, his failure to complete couples' therapy with K.G., missing seven drugs tests, and missing five visits with the children. However, the record indicates that, while Father did not fully complete his plan, he substantially complied with his service plan. He completed the drug and alcohol assessment and was attending outpatient drug treatment and voluntary NA classes; the random drug tests to which he submitted were negative. He completed the psychological assessment and engaged in individual therapy. He completed parenting classes, maintained stable employment, maintained a stable home, and attended twenty-five visits with his children during which their interactions were appropriate. He had no pending criminal charges to resolve. With respect to the requirement of couples' therapy which he did not complete, the record contains evidence that the current status of the relationship between Father and K.G. was one of co-parenting, rather than a romantic relationship. Logsdon admitted he did not know any details about their relationship, but speculated they were still in a romantic relationship because they shared a phone and arrived to visits together. However, K.G. testified at trial they now had an "open relationship" but continued to act as "Mom and Dad" to their daughter A.N.J. Further, K.G. was incarcerated at the time of trial and the record is not clear how long she had been in jail. Completion of couples' therapy with K.G. while she was in jail would have been impractical if not impossible.

### D. Sufficiency of the Best Interest Evidence

Viewing the evidence in the light most favorable to the trial court's best interest findings, and assuming resolution of disputed facts in favor of the findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination of Father's rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266 (legal sufficiency standard). However, after considering all the evidence presented, including the disputed and contrary evidence, under

the factual sufficiency standard, we cannot say that the "degree of proof" rose to the level of "clear and convincing" as required to support the best interest findings. *See* TEX. FAM. CODE ANN. § 101.007. After deferring to the trial court's credibility assessments, and giving full credence to Logsdon's testimony, the quality of the proof on best interest is lacking and failed to meet the heightened burden of proof. Setting aside Logsdon's testimony about Father's failure to fully complete his service plan (which Father does not challenge), his testimony concerning the suspected drug use by Father was conclusory and based on speculation and "belief," with no hard evidence of dirty drug tests or the confirmed presence of drugs in Father's home. *See Gunn v. McCoy*, 554 S.W.3d 645, 662 (Tex. 2018) (testimony offered with no basis to support it is "merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection") (quoting *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex. 2014)); *see also Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam) (when a witness does not provide underlying facts to support a conclusion, the testimony is conclusory and amounts to no evidence).

Similarly, Logsdon's testimony about K.M.J.'s sexual abuse outcry was conclusory and vague—only that an outcry was made—with no supporting details that could lead to a "firm belief or conviction" that the allegation was true. The fact that K.M.J. said nothing about sexual abuse at her Child Safe interview must be weighed against her outcry made shortly before the termination trial began. Logsdon's testimony that K.M.J. suffered from eating issues before her removal and did not suffer from them at her aunt's home could support an inference that her improvement was a result of being away from Father, but could equally support an inference that her improvement was due to her treatment and medication at Laurel Ridge or her removal from her mother's presence. *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (per curiam) ("The equal inference rule provides that a jury may not reasonably infer an ultimate fact from meager

circumstantial evidence 'which could give rise to any number of inferences, none more probable than another.'"). Given the meager nature of the evidence in favor of the trial court's best interest findings, we cannot conclude the evidence is factually sufficient to produce "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (conclusory "best interest" testimony such as a caseworker's testimony that a child would be better off with a new family, even if uncontradicted, does not amount to more than a scintilla of evidence and does not meet the clear and convincing standard). We therefore hold that the Department failed to meet its heightened burden to establish by clear and convincing evidence that termination of Father's parental rights is in the children's best interest. TEX. FAM. CODE ANN. §§ 101.007, 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 263.

## CONCLUSION

Based on the foregoing reasons, we reverse the portions of the trial court's orders terminating Father's parental rights to K.M.J. and A.N.J. and remand the causes for further proceedings. The trial court's orders are affirmed in all other respects, including the portions of the orders appointing the Department as sole managing conservator of the children.

Liza A. Rodriguez, Justice