

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00678-CV

In the Interest of **N.M.**, X.T. and A.T., Children

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-02354
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
                Rebeca C. Martinez, Justice
                Jason Pulliam, Justice

Delivered and Filed: April 13, 2016

AFFIRMED

A.M.,[1] who is the mother of the children the subject of this suit, appeals from the trial court's final judgment terminating her parental rights to her three children, N.M., X.T., and A.T. A.M. argues the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest. We conclude the evidence was legally and factually sufficient to support the trial court's finding and, therefore, affirm the trial court's judgment.

---

[1]To protect the identity of the children, we refer to appellant by her initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

The Department of Family and Protective Services filed its original petition for protection of the children, for conservatorship, and for termination of parental rights on October 3, 2014. Almost a year later, on September 4, 2015, the trial court held a trial on the merits. At trial, the State presented four witnesses: a Department caseworker, a licensed professional counselor, a friend of A.M.'s most recent boyfriend, and the children's foster mother. In addition, A.M. testified on her own behalf. A.M. also presented testimony from her sister and her stepmother.

After hearing all the evidence, the trial court found that termination of A.M.'s parental rights was in the best interest of the children. The trial court also found that A.M.: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being [section 161.001(1)(D)]; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being [section 161.001(1)(E)]; (3) constructively abandoned the children [section 161.001(1)(N)]; (4) used a controlled substance in a manner that endangered the health or safety of the children [section 161.001(1)(P)]; and (5) had been the cause of the children being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription [section 161.001(1)(R)].

A.M. appealed.

**STANDARDS OF REVIEW**

In reviewing the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a strong belief or conviction that its finding was true. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. If we

conclude that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude the evidence is legally insufficient. *Id*.

In a factual sufficiency review, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We must consider whether disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

### APPLICABLE LAW

Termination of parental rights under section 161.001 of the Texas Family Code requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in section 161.001(1)(A)-(T), and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1),(2) (West Supp. 2015). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2014).

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, there is also a presumption that the prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2015). Stability and permanence are paramount in the upbringing of children. *In the Interest of J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Therefore, the stability of the home environment is crucial to determining the children's best interest. *In the Interest of D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.). Children require secure, stable,

long-term, continuous relationships with their parents or foster parents. *Castorena v. Texas Dept. of Prot. & Regulatory Serv.*, No. 03-02-00653-CV, 2004 WL 903906, at \*10 (Tex. App.—Austin 2004, no pet.).

In evaluating the best interest of the child, we may consider the factors articulated in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id*.

The same evidence proving acts or omissions under section 161.001(1) of the Texas Family Code may be probative of the children's best interest. *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). There is no requirement that evidence be presented as to each of the *Holley* factors. *Id*. at 27. A best interest analysis may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In the Interest of E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The trier of fact may measure a parent's future conduct by her past conduct and determine whether termination of parental rights is in the children's best interest. *Id*. The *Holley* factors focus on the best interest of the children, not the best interest of the parent. *Dupree v. Texas Dept. of Prot. & Regulatory Serv.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

**DISCUSSION**

On appeal, A.M. challenges the sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest. The following evidence was presented at trial.

*Caseworker*

A Department caseworker, Vanessa Reyes, testified that she made her first contact with A.M. at the initial hearing. At this hearing, the trial court did not order the children's removal; instead it ordered A.M.'s mother, the children's grandmother, to supervise A.M.'s interaction with the children. The day after the hearing, Reyes made an unannounced visit to the home where A.M. was living with N.M., X.T., and A.T. When Reyes arrived, A.M. and the children were present but the children's grandmother was not at home. The home, where A.M. lived with her mother and other family members, was badly infested with roaches. When the lights were turned on, the roaches scattered. Roaches were all over the baby's bottles. Roaches were coming out of the refrigerator. Additionally, the sleeping arrangements were inappropriate and unsanitary. A.T., who was a newborn baby, did not have a bassinette or a crib; she was sleeping in a bed with A.M. and A.M.'s new boyfriend. The adults could have easily rolled over on the baby and suffocated her. X.T., who was three years old, was sleeping on the floor on a sofa cushion. N.M., who was eight years old, was also sleeping on the floor. N.M told Reyes that roaches crawled through her hair at night while she was sleeping on the floor and it scared her. Reyes also said that, in light of the amount of roaches in the home, having the older children sleep on the floor was "just unsanitary."

A.M.'s history of drug use was another circumstance that caused the children to come into the Department's care. A.M.'s youngest child, A.T., had tested positive for amphetamines when she was born. There was a concern that A.T. would have developmental delays because of A.M.'s drug use during pregnancy. A.M. was ordered to participate in drug testing during the pendency

of this case. According to Reyes, A.M. understood that staying off drugs was important to the return of the children. A.M. had one positive drug test during the pendency of this case. A hair follicle test administered in December 2014 was positive for amphetamines and methamphetamines. Additionally, on multiple occasions, A.M. refused to provide a sample for drug testing. Specifically, A.M. refused to be swabbed on May 28 and June 26, 2015; she refused to provide a hair follicle sample on June 30, 2015; and she failed to appear for urinalysis testing on July 29, 2015.

A.M. also had a pattern of volatile relationships. A.M. had a domestic violence incident with the father of her two younger children, and a protective order was in place against him. Additionally, the father of A.M.'s older child admitted that he had assaulted A.M. Finally, A.M. and her current boyfriend, G.A., were involved in several domestic disturbances while this case was pending. Because of these disturbances, the police were dispatched to A.M.'s home on two occasions. A.M. admitted to Reyes that domestic violence had occurred, but also minimized the nature of the disturbances or blamed the disturbances on her mother. Notwithstanding the volatile nature of their relationship, the caseworker believed that A.M. was presently engaged to be married to G.A.

A.M. failed to consistently visit the children while the case was pending. In fact, A.M. failed to visit the children from May 9, 2015 to July 19, 2015, a period of eleven weeks. During this time period, the children repeatedly asked about their mother. Nevertheless, A.M. avoided the Department entirely, and she did not call to check on the status of the children. When A.M. finally did attend a visit, the children were very happy to see her. As for the tenor of the visits, Reyes said they were appropriate. However, A.M. tended to spend a lot of the time telling the children what she was doing, rather than asking the children about school or the children's activities. Reyes believed the two oldest children had bonded with their mother, but the youngest child had not.

Reyes acknowledged that the trial court had ordered extended visits for A.M. and the children in late February or March 2015. At the time, A.M. was in compliance, and Reyes did not have any serious concerns about A.M. having extended visits. However, Reyes changed her mind when she learned that the police had been called out to A.M.'s home again. Reyes also had a conversation with A.M.'s mother that caused her to be concerned about the stability of the home, the relationship between A.M. and her mother, the other individuals who were living in the home, and the alcohol being consumed in the home.

According to Reyes, A.M.'s living conditions did not improve during the pendency of this case. The home visit Reyes conducted in March 2015 went well because the home was in compliance. However, in May 2015, Reyes made another unannounced home visit. During this visit, Reyes observed that the electricity to the house had been shut off, and it appeared that A.M. and her family were siphoning electricity from a neighbor's house. Reyes thought the configuration of the electrical wires was unsafe. At this point, Reyes felt that no positive changes had been made in the environment. Some of the other adults living in the home, such as A.M.'s sister's boyfriend, had a criminal history, and the police had been called to the home because of disputes between A.M.'s mother and A.M.'s boyfriend, G.A. A.M. and her mother were fighting as well. A.M.'s room continued to be inappropriate. The baby's crib was full of stuff, the room was extremely cluttered, and it was infested with gnats. According to Reyes, A.M. was unable to maintain a house with sanitary and safe conditions for three children.

Reyes acknowledged that A.M. had completed parenting and domestic violence classes. Nevertheless, A.M. continued to be involved in a volatile relationship and A.M. was not honest and forthcoming about it. Based on all of these circumstances, Reyes did not feel that A.M. could provide for the children's physical and emotional needs.

Reyes further testified that all three children were living in the same foster home and were doing very well. The children had been in the same home since November 2014 and had bonded with their foster parents. The older children called their foster parents "Mom" and "Dad." They also called A.M. "Mom." The youngest child, who had tested positive for amphetamines when she was born, was receiving early childhood intervention services, specifically speech and occupational therapy. The foster mother handled this well. The interactions between the youngest child and her foster parents showed that bonding had taken place. The two older children were attending school. The oldest child, N.M., had her own room. The children went on outings with their foster family and were genuinely happy. The children loved their foster family, and the home was clean, stable, and drug free.

*Counselor*

Carlos Castillo Nunez, a licensed professional counselor, testified that he provided services to A.M. from November 13, 2014, to June 9, 2015. A.M. was consistent in attending counseling sessions until June 2015 when she failed to show up for an appointment. Nunez never heard from A.M. again.

Nunez said A.M. had made progress in some areas, but had failed to make progress in other areas. Specifically, Nunez felt that A.M. had made progress in decreasing her anxiety and depressive thoughts, but still struggled with taking responsibility for the removal of her children, her drug use, and her unhappy relationships. A.M. denied that she used drugs, but Nunez knew a hair follicle test showed A.M. was drug positive during this case. A.M. was in an abusive relationship with G.A., and A.M. and her mother also had issues. A.M.'s mother had kicked her out of the house and the police had been called. Nunez said there were still many issues that placed the children at risk, namely A.M.'s relationship with G.A., the instability in the home, and her inability to be forthcoming about her drug use. Nunez also stated that he did not think that A.M.

would directly harm her children, but her poor decision-making and failure to deal with her drug use would indirectly place her children at risk. Nunez did not think A.M. had a learning disability, but she did have dependent traits that made it difficult for her to make sound decisions. Nunez also said he did not know how long it would take for A.M. to acknowledge her drug use.

*Friend/Acquaintance*

Harry William Guerra testified. Guerra had known G.A. since he was a child and he had met A.M. In the past, Guerra had tried to help G.A. Guerra hired G.A. to work for him, but had to fire him because he was high at work. Guerra explained that his business was dangerous, and he did not want G.A. to get hurt, nor did he want that kind of liability. Guerra also said he saw A.M. smoking and drinking while she was pregnant. Guerra said he never saw A.M. use drugs; and that the only time he actually saw G.A. use drugs was about ten years ago. Guerra did not think G.A. and A.M. had a good relationship; they said they loved each other, but they did not create a "family environment." Guerra testified that if the children were returned to A.M., he would be concerned for them.

*Foster Parent*

J.N.B., the children's foster mother, testified that the children were happy. N.M., who was nine years old and in the fourth grade, loved spending time with both of her foster parents. N.M. looked forward to doing activities together, enjoyed going to church, and spending time with her friends. N.M. expressed affection for both of her foster parents, and asked to spend time with each of them. However, N.M. sometimes asked for A.M. N.M. was attached to both of her younger siblings. Because of this attachment, J.N.B. believed it would be detrimental to separate N.M. from her younger siblings.

X.T., who was four years old and attended pre-kindergarten, frequently expressed his love for both his foster parents. X.T. told his foster parents that he wanted to stay in their home. X.T. did not ask for A.M.

The youngest child, A.T., was about a year old. A.T., who had special needs because she was born drug positive, was receiving services for her verbal skills and her gross motor movements. A.T. was now able to crawl and stand. The only parents A.T. had known were her foster parents. Additionally, A.T. tended to become upset when held by strangers, but her foster parents were able to console her.

J.N.B. explained that she and her husband love the children and are providing them with a safe, stable, drug-free environment. If possible, J.N.B. and her husband planned to adopt the three children and provide them a permanent home.

### A.M.

A.M. testified that back in March 2015 it looked like her children were going to be returned to her because she was in compliance. However, when the Department failed to give her extended visits with her children, she became very depressed and started drinking. During the two months when A.M. did not visit her children and comply with her service plan, she was very upset about this case and it affected her communication and her relationship with the Department caseworker.

A.M. admitted she had made bad choices. In particular, A.M. said she had made bad choices with regard to her romantic relationships. A.M. admitted that she had been involved in two relationships marred by domestic violence. However, A.M. had now successfully completed domestic violence classes and she had learned a lot. A.M. understood that domestic violence affects children. Nevertheless, even after completing domestic violence classes, the police had been dispatched to A.M.'s home for domestic disturbances. A.M. explained that in the first instance she and her mother were having a conflict and she just wanted to obtain some information

from the police. No one was arrested and there were no allegations that anyone had hit anyone. A.M. further explained that in the second instance she was not present at the house when the police were called.

A.M. also admitted that she and G.A. had had an argument at a Whataburger and two people came by and tried to help her. Apparently, these people saw G.A. yelling at A.M. and they thought G.A. wanted to do something to her. A.M. had told a police officer that G.A. had become very upset and was "cussing" at her. A.M. also admitted that she had made a police report against G.A. on another occasion because he had scratched the roof of her car. A.M. denied that G.A. ever physically abused her. A.M. also said that G.A. was not in her life anymore and she was not dating him.

A.M. admitted she was pregnant. A.M. said she had a doctor's appointment scheduled for later in the month. According to A.M., the father of this child was G.A. A.M. explained that the reason she denied her current pregnancy to the caseworker was because she did not know she was pregnant when the caseworker asked her about it.

A.M. said she had not engaged in any drug use with the exception of testing positive for methamphetamines during this case and her youngest child being born positive for amphetamines.

As to her relationship with her children, A.M. said that they were her everything. A.M. claimed that during her visits she played with her children and asked them all kinds of questions. A.M. also said her children cried for her and wanted to come home.

In the last month, A.M. had taken steps to improve her life, including obtaining an apartment separate from her mother, attending counseling, and attending Alcoholics Anonymous meetings. A.M. further indicated that she had her family to support her. A.M. pointed out that people make mistakes, but A.M. admitted to her mistakes.

A.M. was currently living at her mother's house, but planned to begin living in her new apartment later in the month. A.M. was currently employed on a part-time basis. A.M. denied that her family members had criminal histories or a history of drug use. A.M. said that even though she refused to submit a hair follicle sample when requested in June 2015, the next day she changed her mind and provided the sample. A.M. also said that she understood that the reason she did not get the opportunity to have an extended visit with her children was because of the police report that was made on April 13, 2015.

### A.M.'s Sister

Next, A.M.'s sister testified she has helped A.M. become better and improve her situation. A.M.'s sister had facilitated A.M.'s current counseling sessions, AA meetings, and housing arrangements. A.M.'s sister was aware of A.M.'s past use of methamphetamines. A.M's sister said that she had noticed an improvement in A.M. since she began taking medicine for her depression. A.M. was happier, very energetic, and social.  A.M.'s sister had several children, and she indicated that A.M. was very good with them.

### A.M.'s Stepmother

A.M.'s stepmother, Annette Delgado, testified that she was aware of what was happening in this case. According to Delgado, A.M. had been working to clean up her life. A.M. had always been a good mother and had always done her best. Delgado indicated that some of A.M.'s boyfriends were not the best for her. The only drug use of which Delgado was aware was A.M.'s drinking and some marijuana use when A.M. was a teenager. Delgado was surprised to learn that A.M.'s youngest child tested positive for amphetamines when she was born. Delgado also said that A.M. told her that she was engaged, but Delgado did not know who A.M. was planning to marry. Delgado did not know that A.M. was currently pregnant. In Delgado's opinion, A.M. never wanted to ask for help; she always wanted to "do it on her own."

We now evaluate the trial evidence in light of the relevant *Holley* factors.

As to the acts or omissions indicating the parent-child relationship was not a proper one and the emotional and physical danger to the children, there was a substantial amount of evidence. A.M. had a history of drug use; her youngest child, A.T., had tested positive for amphetamines at birth. In addition, A.M. tested positive for amphetamines and methamphetamines during the pendency of this case, and she refused to participate in drug testing on multiple occasions. A.M.'s pattern of illegal drug use indicated she was unwilling or unable to provide the children with a safe living environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (West Supp. 2015) (providing that a history of substance abuse is a factor that courts should consider in determining whether a parent is willing and able to provide a safe environment). Furthermore, A.M. failed to attend visits with her children for an eleven-week period. A.M. did not contact the Department to explain her failure to visit the children, nor did she call the Department to check on the well-being of the children. Finally, it was undisputed that A.M. repeatedly engaged in relationships that were marred by domestic violence. As even A.M. acknowledged in her testimony, domestic violence has a harmful effect on children. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (providing that a history of abusive or assaultive conduct by the child's family or others who have access to the child's home is a factor that courts should consider in determining whether a parent is willing and able to provide a safe environment).

A.M. presented an excuse for one of her omissions. A.M. stated that the reason she did not attend her visits for eleven weeks was because the Department decided not to give her extended visitation with her children. According to A.M., when she was denied extended visitation with her children, she fell into a deep depression. However, in light of all of the other evidence in this case, including evidence that the extended visitation did not occur because of a domestic disturbance in

which the police were dispatched to A.M.'s home, the trial court was not required to accept A.M.'s excuse for her omission.

As to the emotional and physical needs of the children and A.M.'s parental abilities, the evidence showed that A.M. had problems maintaining a safe and appropriate living environment for her children. At the beginning of the case, A.M.'s newborn baby was sleeping in a bed with her and her new boyfriend, while her two other children were sleeping on the floor in a roach-infested house. Additionally, although A.M.'s visits with her children were generally appropriate, there was some evidence that she did not ask the children questions, but instead recounted her own experiences. A.M. disputed this fact, testifying that during her visits she asked the children plenty of questions. However, the trial court certainly could have resolved this issue against A.M. Furthermore, A.M. never acknowledged that she had a problem with illegal drug use. However, there was ample evidence that A.M. did in fact have a drug use problem. A.M. tested positive for amphetamines and methamphetamines during this case and A.T. was positive for amphetamines when she was born. In addition, A.M. refused multiple drug tests during this case. Significantly, the counselor who treated A.M. believed that A.M.'s poor decision-making and her failure to deal with her drug use placed the children at risk. Furthermore, A.M. was currently pregnant and had been observed drinking alcohol and smoking while pregnant.

As to the desires of the children, little evidence was presented. The children's foster mother testified that X.T. has expressed a desire to remain with his foster parents. She further testified that N.M. asked for her biological mother, A.M. On the other hand, A.M. testified that the children wanted to come home.

As to the stability of A.M.'s home, there was ample evidence that A.M.'s home was not stable. Granted, on one occasion, the caseworker felt A.M.'s home was appropriate for the children. However, at a subsequent home visit A.M.'s home was unsanitary and unsafe for the

children. Furthermore, even though A.M. had completed domestic violence classes and claimed to have benefitted from these classes, the evidence showed that A.M. was still involved in domestic disturbances both in her home and in public.

As to the Department's plans for the children and the stability of their current placement, the evidence showed that all three children were currently living in the same home with a foster family. All of the children had a good relationship with their foster parents and were happy. The foster family was planning to adopt all three children. The caseworker witnessed the interaction between the children and the foster parents and indicated it was appropriate; she also felt the foster mother was capable of meeting the special needs of the youngest child, A.T.

In arguing that the evidence was legally and factually insufficient to support the trial court's finding that termination was in the children's best interest, A.M. argues that there was no evidence adduced as to several of the *Holley* factors. However, as previously stated, the Department was not required to present evidence as to each and every *Holley* factor. *See C.H.*, 89 S.W.3d at 27.

A.M. also argues the evidence was legally and factually insufficient to support the trial court's best interest finding because some of the *Holley* factors weighed in her favor. A.M. first argues that the stability of the home factor weighed in her favor because the Department's main concerns were the cleanliness of her home and the fact that too many adults were living there. A.M. claims she alleviated these concerns by finding new housing, separate from her mother and her other family members. However, in making this argument, A.M. fails to fully grasp the scope and nature of the Department's concerns. Although the safety and cleanliness of A.M.'s home were part of the Department's concerns, it was also concerned about A.M.'s pattern of engaging in volatile relationships and her unaddressed illegal drug use. Furthermore, at the time of trial, A.M. was still living in the same home. Although A.M. planned to move to an apartment later in the month, few details were presented about her new living arrangements. A.M. further argues that

her current participation in programs such as individual counseling and mental health treatment weighed in her favor. A.M. emphasizes that she accessed these programs on her own, without the Department's assistance. However, even according to A.M.'s own testimony, A.M.'s participation in these programs did not occur until just weeks before trial. Additionally, earlier in this case, A.M. abruptly stopped attending individual counseling sessions with her former counselor and refused to participate multiple drug tests. Therefore, notwithstanding A.M.'s arguments, we conclude the trial court was not required to find that any of the *Holley* factors weighed in A.M.'s favor.

Based on the totality of the evidence presented, we are of the opinion that a reasonable factfinder could have formed a firm belief or conviction that termination of A.M.'s parental rights was in the children's best interest. Considering all of the relevant factors under the applicable standards, we conclude the evidence was legally and factually sufficient to support the trial court's finding that termination of A.M.'s parental rights was in the children's best interest.

## CONCLUSION

The judgment of the trial court is affirmed.

Karen Angelini, Justice