

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-16-00259-CV

**IN THE INTEREST OF A.P.** and O.B., Children

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-01950
Honorable Martha B. Tanner, Judge Presiding[1]

Opinion by: Sandee Bryan Marion, Chief Justice

Sitting: Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Jason Pulliam, Justice

Delivered and Filed: October 5, 2016

AFFIRMED

Christopher B. and Brittany B. appeal the trial court's order terminating their parental rights to their child O.B. Brittany also appeals the termination of her parental rights to her child A.P. Brittany contends the trial court erred in admitting hearsay, and the evidence is legally and factually insufficient to support the trial court's finding of the statutory predicate grounds for termination. Christopher and Brittany both contend the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in their respective children's best interest. We affirm the trial court's order.

---

[1] The Honorable Barbara H. Nellermoe presided over the trial and verbally pronounced the order. The Honorable Martha Tanner signed the written order.

**BACKGROUND**

The trial court terminated Christopher and Brittany's parental rights after a three-day bench trial held on January 11-13, 2016. The following summarizes the trial testimony.

In July of 2014, an investigator with the Texas Department of Family and Protective Services was assigned to investigate the case involving A.P. and O.B. The investigator had difficulty locating the family because of the number of times they had moved. The investigator first met with Brittany at the home of a friend where she was staying because they had been evicted for failing to pay rent. At that time, O.B. was the only child living with her because Brittany sent A.P. to live with her sister and brother-in-law in December of 2013 where she believed A.P. would be safer. Brittany told the investigator that Christopher's behavior had become very erratic over the past three to six months. Brittany stated she believed Christopher would not harm O.B. since she was his biological child. The investigator believed the domestic violence had been occurring for approximately a year but had escalated in the prior six months.

Brittany informed the investigator that she had been the victim of domestic abuse and had been strangled and raped by Christopher. Brittany stated O.B. was present during the domestic violence. Brittany explained Christopher was hallucinating and seeing names and words of a sexual nature on the walls, floors, Brittany's body, and O.B.'s body. The investigator noted Brittany had several large scars on her arms. When the investigator asked Brittany about one scar, which was a large name carved across her forearm, Brittany stated the wound was self-inflicted.

The investigator drug tested Brittany, and she tested positive for methamphetamines. Brittany stated Christopher was also using methamphetamines and had been mentally unstable with increasingly erratic behavior.

The investigator also spoke with Christopher. Christopher initially denied any domestic violence but later stated he treated Brittany like a prostitute. Christopher admitted he experienced

hallucinations and that he would hold a knife against Brittany's skin with the thought to physically put the names on her that he saw on her skin. Christopher refused a drug test but admitted to using methamphetamines.

The investigator also interviewed A.P. who stated "mommy and daddy hit each other in the face and that was why mommy had a black eye." The investigator believed A.P. witnessed the domestic abuse.

At trial, Brittany's testimony differed from her prior statements to the investigator. Brittany testified she had been involved with Christopher for five years. Brittany stated she placed A.P. with her sister in December of 2013 due to financial difficulties. Brittany denied that A.P. witnessed Christopher hitting her. She also denied telling Dr. Jacob Pickard, the therapist who evaluated her in October of 2014, that Christopher had raped her or had hit her at any time. Brittany admitted Christopher was seeing sexually explicit statements written on the walls about Brittany engaging in an affair. She denied stating Christopher had stood over her with a knife in his hand. Brittany also denied taking pictures of injuries to her face. Brittany stated her decision to carve Christopher's name on her arm was a "dumb decision" she made to "get him to see the difference between reality and delusions." In response to whether Christopher saw visions on O.B., Brittany stated he saw hallucinations everywhere. She also stated Christopher had a suicidal thought in March of 2015 but sought help. Brittany testified she had last been employed from December of 2013 to April of 2014 in records management. She stated she had lived in six places in the past five years. Brittany testified Christopher was disabled and began receiving $3,187 per month in April or May of 2015. She also stated Christopher physically inspects O.B. during their visitations.

Brittany had another baby in July of 2015, and she stated they were able to handle the stress in raising him by communicating instead of resorting to drugs and violence. Although Brittany admitted she and Christopher tested positive for drugs when the Department first removed the

children, she stated they both tested negative since that time. Brittany testified Christopher and his doctor agreed that Christopher could discontinue his medication in July or August of 2015 because he was no longer having hallucinations. Two photographs of Brittany depicting injuries to her face were introduced into evidence. Brittany testified the injuries resulted from her and Christopher falling to the ground when Brittany began slapping him during a panic attack while he attempted to restrain her.

Mark B., Brittany's brother-in-law, testified he and his wife, Brittany's sister, were concerned for A.P.'s safety and stability. Mark was also concerned about Brittany's relationship with Christopher when he observed her with a black eye. Brittany also told her family Christopher had choked and raped her. Mark testified Christopher had made threats against him and his family. Mark and his wife wanted to adopt A.P. and O.B. Mark testified about an incident that occurred on May 16, 2015, in which A.P. told him he used to shower with Christopher, and Christopher let A.P. wash his penis. A.P. sees a therapist once a week and his behavior has improved. When A.P. first moved in with Mark and his wife, A.P. had a very bad temper and would punch or kick the dogs, slam the doors, and scream at them to get out of the house. When Mark asked A.P. why he hurt the dogs, he responded that was what Christopher did to his dog. A.P. also kicked his grandmother and called her a "cunt." When questioned, A.P. stated Christopher called Brittany that name. A.P. threw a Frisbee on the playground at school and screamed "take that, motherfucker." Since being in therapy, A.P. has not cursed in many months and no longer punches or screams but is more in control of his emotions. Mark testified the children were bonded to him and his wife.

Esther P., Brittany's mother, testified Brittany called her in May of 2014 from the balcony of her apartment. Brittany told Esther she was afraid and that Christopher and another woman were cutting up her clothes. Esther requested a police escort to accompany her to the apartment.

When she went up the stairs, Christopher was very angry and cussing at her. Esther saw Brittany had a black eye and a bruise on her arm. Brittany told Esther she fell over some clothes on the floor and refused to press charges against Christopher or leave the apartment with Esther. Esther recalled another time when A.P. told her a couple was living with them, and the man was sleeping with A.P. on the couch. She later learned the couple were drug dealers. Esther testified she last gave Brittany money about four months before trial. Since the Department filed the petition in the underlying cause, Brittany has stayed away from the family for long periods of time.

Christopher testified he has five children including the two children with Brittany. He stated the monthly disability payment he now receives helps with his finances; however, he still has outstanding debts, including $85,000 in outstanding child support. He also stated he and Brittany had lived in the same apartment for almost a year. Christopher denied taking methamphetamines when the children were present but admitted he would go outside, use methamphetamines, and then be around the children. He denied beating Brittany but admitted he swung a makeup box and accidently hit Brittany in the face. Christopher denied choking Brittany, standing over her with a knife, or raping her. He admitted having hallucinations including seeing a sexually explicit statement on Brittany's forehead regarding another man, but he denied seeing writings on O.B. Christopher admitted ripping up Brittany's clothes on one occasion but denied Brittany was injured on that occasion. Christopher stated he was no longer taking antipsychotic medication and had informed his doctor when he stopped taking the medication several months earlier. He had not seen his doctor for about three or four months but no longer had hallucinations. Christopher admitted he took showers with A.P. but denied he acted inappropriately. Christopher believed his sister-in-law and Mark were having A.P. make up stories but denied making any threats against their family. Christopher believed his sister-in-law and Mark were neglecting the children because they showed up for visits dirty and A.P.'s teeth had not been brushed for weeks.

Christopher denied physically inspecting O.B. during their visits. He also denied saying he used Brittany as a prostitute. With regard to his service plan, Christopher testified he attended his visitations with the children, completed a domestic violence class, participated in a parenting session and parenting education course, completed a drug assessment and psychological evaluation, and continued to attend counseling. Christopher stated all of his drug tests were negative since the Spring of 2015. Christopher was last employed in December of 2011 but was receiving $3,187 in monthly disability at the time of trial. He admitted, however, that he had not paid child support while the case was pending. He also admitted he did not call the caseworker to ask about the children. Christopher stated Brittany carved the word "whore" on her arm.[2]

Dr. Jacob Pickard, a clinical psychologist, evaluated Christopher and Brittany, and his written reports were admitted into evidence. Brittany reported several instances of domestic violence including a black eye, choking, and Christopher standing over her with a knife while she was sleeping. Brittany also reported Christopher had hallucinations and would see writing on O.B. With regard to Brittany's testimony denying these reports, Dr. Pickard stated her denials are an indication that she had not benefited from the services she was provided. Dr. Pickard also stated Brittany was putting Christopher's interest ahead of the children's and, as a result, would be unable to protect the children. Dr. Pickard testified if Brittany and Christopher continued to deny the domestic abuse and that their prior drug use harmed the children, they did not benefit from the services provided to them. Christopher reported being diagnosed with major depressive disorder with psychotic features while in the military. Christopher also discussed his hallucinations and reported seeing writings on O.B. He admitted standing over Brittany while she was sleeping and thought about cutting the words he saw off her skin. He also admitted being under the influence

---

[2] Brittany testified she carved Christopher's name on her arm and denied she ever carved the word "whore" on her arm.

of methamphetamines in front of the children. Dr. Pickard determined Christopher had chronic mental illness with psychotic components. Dr. Pickard stated he would be very concerned if Christopher had not seen a doctor in four months and was not taking medication. He also stated it would be very rare and very unlikely that a person with Christopher's mental health problems would be able to control their own behavior without mental health assistance. Dr. Pickard had not seen Brittany or Christopher since he completed the evaluations in October and November of 2014. Dr. Pickard stated Christopher completing his service plan and attending counseling were positive steps; however, Christopher would need to be engaged in counseling not just attending the sessions to truly benefit.

The Department's caseworker testified she was the caseworker the entire time the case was pending and termination of Christopher and Brittany's parental rights would be in the children's best interest. She also testified she did not believe Brittany was truthful. Although Brittany first admitted the prior domestic abuse and drug use, Brittany later denied any such problems. The caseworker did not believe Brittany had achieved anything from the courses she had taken and had explained to Brittany the service plan was not simply a check list of items to be completed. Although Brittany had completed several items listed in the service plan, Brittany had not made any progress towards the actual goals and places her relationship with Christopher ahead of the children's needs. During visits with the children, Brittany was not able to balance her attention and ended up favoring one child or the other, and Brittany did not call and ask about the children between visits. Although Christopher and Brittany had completed services listed in their plans, the caseworker testified they have not made any positive life changes or demonstrated that they would put the children's needs before their own. In addition, they continue to deny all allegations of physical violence. The caseworker was told Christopher checks O.B. from head to toe almost every single visit, and A.P.'s behavior becomes aggressive, erratic, and angry when he visits with

Brittany. During one visit, Brittany told A.P. he could not go home if he did not stop lying. When the caseworker once asked A.P. why he pushed O.B. down, he responded it was what Christopher did to Brittany. A.P. told the caseworker that Christopher used to hit him so hard he could not sit down. A.P. told both his uncle and his therapist about the incident in the shower. When O.B. would get upset, she would bang her head on the wall or hit herself in the head saying "bad girl, bad girl, bad girl." The caseworker admitted Christopher and Brittany were caring for their new baby, demonstrating their parenting skills towards him; however, Christopher and Brittany refuse to take responsibility for the harm done to A.P. and O.B.

Brittany's attorney re-called Brittany to testify. Brittany testified she learned a lot from the classes she had taken and admitted to three instances of physical violence in April and May of 2014 when she and Christopher were under the influence of methamphetamines. Brittany accepted responsibility for the children's removal but did not agree with the manner in which the allegations were worded. Brittany explained she focuses more on A.P. during her one-hour visit with both A.P. and O.B. because she then has an additional one-hour visit with O.B. at which Christopher would be present. Brittany and Christopher continue to see a therapist and have learned to handle stress.

## HEARSAY

In her first issue, Brittany contends the trial court erred in allowing Mark to testify regarding A.P.'s sexual abuse outcry.

Section 104.006 of the Texas Family Code governs the admissibility of A.P.'s outcry and provides a statement made by a child 12 years of age or younger describing alleged abuse against the child is admissible if the trial court finds the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and the child testifies or is available to testify at the proceeding. TEX. FAM. CODE ANN. § 104.006 (West 2014). We review the trial

court's ruling on the admissibility of evidence under an abuse of discretion standard. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014); *In re K.S.*, 76 S.W.3d 36, 42 (Tex. App.—Amarillo 2002, no pet.). With regard to factual findings, a trial court only abuses its discretion if the trial court could reasonably have reached only one decision and not the decision the trial court reached. *Walker v. Packer*, 827 S.W.3d 833, 840 (Tex. 1982).

Because the statement was admitted into evidence during a bench trial, the trial court was not required to hold a separate hearing on the admissibility of the statement but could determine its admissibility when the statement was offered into evidence. *In re K.L.*, 91 S.W.3d 1, 17 (Tex. App.—Fort Worth 2002, no pet.). Furthermore, the trial court was not required to expressly make the findings required by section 104.006. *Id*. Instead, the trial court implicitly made the findings in admitting the testimony. *Id*.

The admissibility of the testimony was first discussed before the trial began. At that time, the Department's attorney informed the trial court A.P. could be made available to testify. Mark subsequently testified he was assisting A.P. with a shower on May 16, 2015. As A.P. was drying off and getting dressed, A.P. asked Mark why he never saw Mark naked. Mark responded it was not appropriate for A.P. to see him naked. A.P. replied he used to shower with Christopher all the time, and Christopher used to let him wash his penis. Given that A.P. made the statement after showering and after he had resided with Mark for almost eighteen months during which he developed a trust level with Mark, the trial court could reasonably have found that the time, content, and circumstances provided sufficient indicia of the statement's reliability. In addition, the Department stated A.P. was available to testify. Accordingly, the trial court did not abuse its discretion in admitting the testimony.

## SUFFICIENCY OF THE EVIDENCE

Brittany challenges the sufficiency of the evidence to support the trial court's predicate statutory findings under subsection 161.001(1)(b) of the Texas Family Code. In addition, Brittany and Christopher both challenge the sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Code, the Department has the burden to prove: (1) one of the predicate grounds in subsection 161.001(1)(b); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2015); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable burden of proof is the clear and convincing standard. TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In reviewing the legal sufficiency of the evidence to support the termination of parental rights, the court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*.

In reviewing the factual sufficiency of the evidence to support the termination of parental rights, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that

a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

### A. Predicate Findings

With regard to Brittany, the trial court found Brittany: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; and (2) engaged in conduct or knowingly placed the children with a person who engaged in conduct which endangered their physical or emotional well-being. The testimony at trial established that Brittany exposed the children to domestic violence and drug use. A parent's exposure of a child to family violence and illegal drug use endangers a child's physical or emotional well-being and is sufficient to support the trial court's predicate findings. *See In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet); *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125-26 (Tex. App.—Fort Worth 2003, no pet.). Although Brittany argues she sent A.P. to live with her sister to prevent him from being endangered, the evidence at trial established A.P. had already been endangered by his exposure to the domestic violence and drug use before Brittany sent him away.

### B. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2015). In determining whether a child's parent is willing and able to provide the child with a safe environment, the court should consider: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude,

frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id*. at § 263.307(b).

Courts also may apply the non-exhaustive Holley factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody of the child; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id*.

The foregoing factors are not exhaustive, and "[t]he absence of evidence about some of [the factors] would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *In re C.H.*, 89 S.W.3d at 27. "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

When the Department filed its petition, A.P. was five and O.B. was almost two. Based on their ages, both were physically and mentally vulnerable. Although the children loved Brittany, evidence was presented that A.P. was afraid of Christopher. In addition, the children were bonded with their aunt and uncle.

A.P. and O.B. had both been exposed to domestic violence and drug use. A.P. also made statements regarding sexual abuse and testified Christopher hit him so hard he could not sit down. After their removal, both A.P. and O.B. exhibited behaviors attributable to the violence and conduct they had witnessed. A.P. recalled Christopher hitting Brittany and other acts of violence which he used to excuse his own inappropriate behavior. O.B. would hit herself in the head and call herself a bad girl. With regard to the future, Brittany was in denial about the past domestic violence, and her testimony conflicted with her prior reporting of abusive acts by Christopher. In addition, Dr. Pickard testified Christopher's mental condition would require ongoing treatment and medication; however, Christopher was no longer taking medication and had not seen a doctor for his condition in four months.

Although Brittany and Christopher had completed the specific actions listed in their service plans, neither had met the goals. The caseworker testified Brittany and Christopher had not demonstrated they would put the children's needs ahead of their own. In addition, although

Brittany and Christopher appeared to be adequately parenting their new baby, the trial judge had reason to question their credibility, and Brittany continued to isolate herself from her family and deny the prior domestic abuse. After Christopher's monthly disability income increased to $3,187, Brittany and Christopher were in a stable home; however, they still were providing no support for A.P. or O.B.

A.P. and O.B.'s aunt and uncle were providing a stable home for the children and planned to adopt them. A.P.'s behavior had improved with regular weekly therapy.

Having reviewed the record, we hold the evidence is sufficient to support the trial court's finding that termination was in the children's best interest.

## CONCLUSION

The order of the trial court is affirmed.

Sandee Bryan Marion, Chief Justice