

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-22-00618-CV

**IN THE INTEREST OF J.M.E.**, C.J.V., T.A.W., R.A.C., and S.S.H.

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-00277
Honorable Kimberly Burley, Judge Presiding[1]

Opinion by:    Liza A. Rodriguez, Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Irene Rios, Justice
               Liza A. Rodriguez, Justice

Delivered and Filed: January 25, 2023

AFFIRMED

Lakendra W. and Christopher V.[2] appeal from the trial court's order terminating their parental rights. They each bring the same issue on appeal: whether the evidence was legally and factually sufficient to support the trial court's finding that termination was in the children's best interest. We affirm.

### BEST INTEREST

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should

---

[1]The Honorable Susan D. Reed presided over the Mother's trial on the merits. The Honorable Kimberly Burley presided over the Father's trial and signed the final order of termination.
[2]To protect the identity of the minor childre, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (citation omitted). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (citation omitted). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*. at 346.

Further, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[3] In

---

[3]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[4] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *5 (Tex. App.—San Antonio Dec. 7, 2022, no pet. h.) (explaining that a best interest finding does not require proof of any particular factors). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied).

In determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28.

The children subject to this suit are eleven-year-old J.M.E., ten-year-old C.J.V., nine-year-old T.A.W., four-year-old R.A.C., and almost two-year-old S.S.H. Christopher V. is the father of C.J.V.[5] Lakendra W.'s bench trial was held on July 21, 2021. Christopher V.'s bench trial was held on August 8, 2022.

---

[4]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).
[5]The other fathers named in this lawsuit did not appeal the trial court's order of termination.

### A. Best Interest Finding Relating to Lakendra W.

At Lakendra W.'s trial, Chantal Valdez, the Department's primary investigator, testified the Department received an incident report stating that law enforcement and EMS had been called to Lakendra W.'s home on February 18, 2021, because J.M.E. had allegedly attempted suicide "by scratching her wrists." Valdez testified that "when emergency personnel arrived, [J.M.E.] was observed with scratches, scars, [and] bruises that did not appear to be self-inflicted." J.M.E. "was unresponsive and was emaciated." Valdez testified that the same day the Department received the report, she was able to see the children at the hospital. According to Valdez, J.M.E. "was severely underweight. She had multiple marks, bruises throughout her body, and they appeared to be in different healing stages. She was nonresponsive." J.M.E., who was just nine years old at that time, weighed only a "bit over thirty pounds." Valdez testified Lakendra W. claimed J.M.E. had suffered a "sudden weight loss" and that two weeks before, J.M.E. had weighed seventy-five to eighty pounds. When Valdez asked Lakendra W. about the bruises on J.M.E., Lakendra W. said the "bruises were self-inflicted."

Valdez testified that at first, Lakendra W. was not cooperative and did not want her to meet the rest of the children. She then agreed to have Walter H.,[6] the father of S.S.H., bring the remaining children to the hospital. Valdez testified the remaining children "looked underweight, very underweight." C.J.V. had a bruise on his face, and the children "were dirty." Thus, the Department proceeded to remove all the children from the home. They were admitted to the hospital for observation.

Valdez testified that when she first met Lakendra W. at the hospital, Lakendra W. did not indicate she was a victim of domestic violence, nor did she indicate she was under any sort of

---

[6]Walter H. has not appealed from the trial court's order terminating his parental rights.

duress at the hands of Walter H. According to Valdez, during the Department's investigation, the children made outcries of physical violence by Lakendra W. and Walter H. "[T]hey said that they were handcuffed to a bar in the bathroom and to the bed." The "children were given one bowl of plain rice or beans for . . . each day [] only three times [per] week." J.M.E. and C.J.V., who were "the most underweight[]," had to "share a bottle of Gatorade that had water [in] it." J.M.E. and C.J.V. had open sores on their bodies. Valdez testified that the "children made outcries about being hit with a dog leash or with an extension cord. And also that they were told to be kneeling on rice—over rice, over a bed of rice." J.M.E. also made outcries of "sleep deprivation in addition to" food deprivation. J.M.E. said that she "would not be able to sleep that long, that—I believe that the—both Walter [H.] and Lakendra [W.] said they would order [her] not to sleep."

Robert Ruiz, a special investigator assigned to assist in the case, spoke with Lakendra W. during a virtual jail interview. Lakendra W. had been arrested for injury to a child. According to Ruiz, she made admissions during the interview:

> The admissions were that [J.M.E.] would eat off the floor. Walter [H.] would instruct her not to feed the children. . . . [Lakendra W. said] Walter [H.] originally placed [J.M.E.] in handcuffs. That Walter [H.] would hit [J.M.E.] and [C.J.V.] with an extension cord and with a dog leash. [Lakendra W.] alleged domestic violence in the home. And she spoke also about Walter [H.] being more aggressive with the two older children, which are [J.M.E.] and [C.J.V.], and that [J.M.E.] would eat off the floor because she was handcuffed to the bunk bed for hours or days since November [2020]. And the longest period of time that [J.M.E.] was handcuffed to this bunk bed was one month. She also did say that [C.J.V.] was handcuffed for the same amount of time.

Ruiz testified a search warrant was executed on the family home by police, during which Ruiz was able to observe the home:

> The home was very, very dirty. There was stuff all over the place. We did observe the bunk beds that were alleged to have been the place where the children were handcuffed. There was also a children's potty right next to that bunk bed. And now it's known that that's where they had to use the restroom because they were handcuffed.

Ruiz testified the police had been looking for handcuffs and any leashes but did not find any. The day after the search of the home, Ruiz requested the visitor logs to the family home and discovered there had been visitors at the home the day before the search warrant had been executed. The visitors were the maternal grandmother and another relative. Ruiz went to the maternal grandmother's home and said some items had been taken out of Lakendra W. and Walter H.'s home according to the log. The maternal "grandmother brought the items out—one of them was a purse. And in the purse, without opening it, just looking into it, [Ruiz] saw two pairs of handcuffs in there."

Ruiz testified that on March 2, 2021, he again went to the jail to speak with Lakendra W. Lakendra W. told him that she and Walter H. had been living together since October 2019. She claimed to have suffered from domestic violence by Walter H. She also claimed he controlled her by making her wear ear buds to work so he could listen to everything she was saying. Ruiz asked Lakendra W. how the child abuse started. Lakendra W. said "it all started" in December 2019, because J.M.E. and C.J.V. had been eating Walter H.'s snacks. Lakendra W. told Ruiz that Walter H. did not like J.M.E. and C.J.V. eating his snacks "because they were, quote, half-breed Mexicans." According to Ruiz, "Lakendra [W.] explained that [C.J.V.] and [J.M.E.] are half Black/half Mexican, and the other children are full Black. So that was one of the main issues." Lakendra W. said that "at the beginning, Walter [H.] handcuff[ed] [C.J.V.] and [J.M.E.] by their wrists and ha[d] them sit against the wall, facing the wall." "But when that didn't work, because the food kept on disappearing, that's when he decided to handcuff their ankles to the bunk beds." Lakendra W. told Ruiz that the children "were fed three times a week, only one time each of those three days, plain rice and beans." "They also had to share one bottle of water a day." At one point, J.M.E. and C.J.V. "were so hungry, they had [T.A.W.] bring them some food from the fridge. Unfortunately, it was raw bacon, so the children had to eat raw bacon." Ruiz testified that three to

four days before the incident on February 18, 2021, a deep freeze had occurred in all of San Antonio, and the family home lost power. Lakendra W. told Ruiz that "the children didn't have any jackets or blankets." "So, they were freezing on the floor."

When Ruiz asked Lakendra W. why she had not brought the children food, she claimed she had been unable to do so because Walter H. would not allow it. When asked why she did not report Walter H.'s abuse, Lakendra W. claimed to be scared and said she did not "have any opportunity to really tell anybody." Ruiz testified,

> I remember having the conversation asking her, "Well, you know, you were pregnant at that time." And, you know, I asked her, "Did you go to the doctor to get your visits done for your pregnancy?" She said, "Yes." But that she wasn't able to say anything because, again, she had the ear buds on and Walter [H.] was listening to her. And then I asked her, "Well, couldn't you have written something down to the . . . doctor saying, 'Hey, I need help. I'm being held against my will. I'm being abused.' Anything like that?" But she didn't have a response to that.

Ruiz asked Lakendra W. whether she had tried to protect the children. Ruiz testified that on "the day of the 18th, February the 18th, she did say that she was begging Walter [H.] to—to allow her to get help because [J.M.E.] was . . . not responding." Ruiz testified that he also met with Walter H. during a jail interview. Walter H., who had also been arrested for injury to a child, denied any abuse:

> [Walter H.] stated that the handcuffs were for him and Lakendra [W.], and the kids grabbed them and would play with them. And as far as the injuries, he stated that the kids fought amongst themselves, and that's what caused the injuries.

Ruiz explained to Walter H. that the children had made multiple outcries to multiple people, and their outcries were consistent. Ruiz further explained that medical staff "had reviewed these children's injuries, and that everything was matching up with what the children were saying." Walter H. denied any child abuse and denied any domestic violence.

Ruiz testified that he mostly believed Lakendra W.'s statements because "a lot of the information she gave when she was admitting to what was going on in the home . . . was consistent

with the outcries and the medical—the medicals that were provided." "But . . . I believe that she left out her involvement in the abuse. And she was trying to pin it solely on Walter [H.], [when] I believe that they both had the same culpability here." When asked why he believed both Lakendra W. and Walter H. were culpable, Ruiz testified:

> Well, both during [J.M.E.]'s forensic interview she discussed how mom would also beat her and her siblings. She also—[J.M.E.] in her interview also stated that mom was the one shopping online . . . for the handcuffs to—and that mom is the one [who] purchased the handcuffs. So, statements like that coming from [J.M.E.] leads me to believe that they were both just as culpable. And I believe that—obviously the mother—right, the mother is the one [who] had these children. The mother should always be very protective of her children. And in this case, the mother was not protective at all and allowed these things to happen and did have the opportunities to ask for help but didn't.

Ruiz further testified he did not find any police reports Lakendra W. may have made in regard to her allegations of domestic violence.

Erin Villanueva, the legal worker, testified J.M.E., C.J.V., and S.S.H. have been placed with a maternal cousin, who is a licensed foster parent. R.A.C. and T.A.W. have been placed in a foster home. Villanueva testified that when J.M.E. was first placed into care, she "was not even able to get out of her hospital bed unassisted." J.M.E. "was severely underweight. She had very low muscle tone. She had a hard time doing . . . day-to-day things like walking long distance or running because of the severity of her abuse. And she also had a lot of vitamin deficiencies." C.J.V. was also "underweight, had low muscle tone, had issues doing day-to-day activities, and he also had a vitamin deficiency." In the hospital, he "still had issues walking long distances." Both J.M.E. and C.J.V. have now been successfully discharged from physical therapy. C.J.V., who had been "severely behind academically," has really improved in school. He has also gained "a significant amount of weight" and is now "on target for height and weight." He "is engaged in individual therapy and is starting to open up about his trauma stories." J.M.E. is now too at a "healthy weight." She is "on target academically," "is very comfortable with her therapist," and is open "about her

feelings." She "had a lot of trust issues with any adult when she came into care because she didn't understand why she was in this situation." She "has really regained . . . a lot of trust."

T.A.W. was slightly underweight when he came into care, but is now better. "And he had some aggressive behaviors initially." His "mental health issues . . . have been addressed by his current placement." His foster parents have been taking him to therapy, and they are "working with the behavior interventionist." T.A.W. is also seeing a psychiatrist, and he is on medication for "ADHD and mood stabilization." Villanueva testified that T.A.W. "has come a long way since [she] initially met with him." "The foster mother has really worked on stabilizing his behaviors [and] on reinforcing positive behaviors." "She has gotten him into a special school that can meet his learning style and give him the attention that he needs." "And she has really . . . given him the attention and the love that . . . he's craved."

Villanueva testified the placements are meeting all the needs of the children. Although two of the children are in a different placement from the other three, they see each other every Tuesday. "The kids love to see each other. They look forward to it. They share a meal together. They play together." Villanueva testified the children have been placed with two different foster families because they "have a lot of needs" and "had a lot of trauma."

Villanueva testified that the two youngest children, R.A.C. and S.S.H., are doing very well. S.S.H. is meeting all his milestones and is "very bonded" with his placement. R.A.C. is ahead "on his milestones according to his pediatrician" and is "also very bonded to his placement." Villanueva testified she had spoken with the three older children, and they all expressed their desire to have no relationship with Lakendra W.

Villanueva testified she met with Lakendra W. and talked with her about "the trauma that the kids [had gone] through and the fact that the children" had no desire to have a relationship with her. Lakendra W. replied that "there was ongoing domestic violence between her and [Walter H.]."

Villanueva testified she had asked Lakendra W. a few times why she had not sought help before J.M.E. was unresponsive, "and her response [was] always, 'I was a victim of domestic violence.'" Lakendra W. did not admit to hitting the children and said she could not "recollect" where the children's injuries came from. Villanueva testified that she also met with Walter H. He denied "ever injuring the children" or there "ever being any domestic violence." When asked why Lakendra W. would not be able to meet the emotional needs of her children, Villanueva testified:

> I think that specifically [J.M.E.] and [C.J.V.] have been through so much trauma that they are going to need an excessive amount of therapy. To this day when they go by prior residences that they lived in with [Lakendra W.], they still start shaking. [J.M.E.] cries—I mean they just have so much fear of seeing [Lakendra W.] that I think it wouldn't be appropriate. And I don't think that [Lakendra W.] would be able to meet those needs.

In considering the above evidence presented at trial, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of Lakendra W.'s parental rights was in her children's best interest. As factfinder and sole judge of credibility and weight of the evidence, the trial court could have determined that the children were subjected to physical and emotional abuse by Lakendra W. and Walter H. *See In re J.O.A.*, 283 S.W.3d at 346 (explaining that trial court, as fact finder, is sole judge of credibility and weight of the evidence). The trial court could have further determined from the evidence that Lakendra W. was not protective of her children and failed to protect them from severe physical and emotional abuse. Further, there was evidence from which the trial court could have determined that the children have improved since their removal from the family home and are doing well in their current placements. Accordingly, we affirm the trial court's order of termination with respect to Lakendra W.

### B.  Best Interest Finding Relating to Christopher V.

At Christopher V.'s trial, Ashley Cortez, the legal caseworker, testified that Christopher V. had been incarcerated throughout the pendency of this case for the crime of being a felon in

possession of a firearm. His family service plan required him to complete parenting classes, a psychological and psychosocial assessment, individual counseling, a drug and alcohol assessment and treatment, and random drug testing. He had not completed any part of his plan, because those services were not offered in the prison where he was being held. Visitation with C.J.V. had also not occurred. Cortez testified the problem was that Christopher V. had been moved around a lot. During his testimony, Christopher V. confirmed that he had been moved to three different facilities in six months.

Cortez testified C.J.V. was living with a maternal cousin and was doing very well in his placement. She testified J.M.E., C.J.V., and S.S.H. (who all live together) "have a very good relationship with their maternal cousin." Cortez complimented the children's manners. "They are doing chores. They have rules and expectations in the home," and they "follow them very well." "They clean their rooms." "They pick up after themselves." The permanency goal for C.J.V. was adoption.

Christopher V. testified he had been incarcerated since March 26, 2017, for being a felon in possession of a firearm and for being in violation of the requirement to register as a sex offender. His original conviction in 1999 was for indecency with a child by contact. Since that time, he failed twice to register as a sex offender: once in 2011 and once in 2016. When asked if his inability to complete his services was directly related to "things that happened and choices [he] made before this case," Christopher V. replied, "Yes." He was then asked if he had made arrangements with any family members while he was incarcerated to take care of C.J.V., Christopher V. replied, "No, ma'am." Christopher V. testified that he had "a very good relationship with" C.J.V. and had "been there since [J.M.E.] was three weeks old, and since my son [C.J.V.] was born, and since [T.A.W.] was a baby also." However, on cross-examination, he was questioned how he could have always been there for ten-year-old C.J.V. when he had been incarcerated much of C.J.V.'s life:

Q:     You would agree with me that, since you've been in jail since 2017, your—
       that would make your son five years old the last time that you actually had
       him in your possession; is that correct?
A.     Yes, ma'am.

In support of his argument that termination of his rights is not in the best interest of C.J.V., Christopher V. emphasizes that he was not responsible for the abuse suffered by C.J.V. because he was incarcerated the entire time. He also claims that he "was deprived of [the] chance to prove his abilities" due to his incarceration. However, "[a] parent's lengthy absence from a child's life during [his] early years due to incarceration creates an 'emotional vacuum' that threatens the child's emotional well-being and indicates that the parent-child relationship is not a proper one." *In re J.M.G.*, 608 S.W.3d 51, 57 (Tex. App.—San Antonio 2020, pet. denied) (citations omitted). Further, the evidence in this case showed a pattern of criminal conduct on Christopher V.'s behalf. *See In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.) ("A factfinder in a termination case may permissibly infer that a parent's future conduct may well be measured by recent deliberate past conduct as it relates to the same or similar situation."). Christopher V. was originally imprisoned for indecency with a child by contact, then twice failed to register properly as a sex offender, and then was convicted of being a felon in possession of a firearm. "Criminal conduct, prior convictions, and incarceration affect[] a parent's life and his ability to parent, thereby subjecting his child to emotional and physical danger." *In re J.J.O.*, No. 04-18-00425-CV, 2018 WL 5621881, at *2 (Tex. App.—San Antonio Oct. 31, 2018, no pet.). Here, the reason Christopher V. has not had a relationship with C.J.V. since C.J.V. was five years old was because of Christopher V.'s intentional criminal conduct and actions. Moreover, after learning about the abuse suffered by C.J.V., Christopher V. gave no information to the Department regarding possible caregivers. Finally, with respect to C.J.V.'s current placement, C.J.V. is doing well with his maternal cousin and his siblings. Given all of the above evidence, we hold the evidence was legally

and factually sufficient to support the trial court's finding that termination of Christopher V.'s parental rights was in C.J.V.'s best interest.

## CONCLUSION

We affirm the trial court's order terminating Lakendra W.'s and Christopher V.'s parental rights.

Liza A. Rodriguez, Justice