

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-00023-CV

**IN THE INTEREST OF B.R.S.**, A.M.S., M.R.S., N.J.S., M.A.S., and L.R.S., Children

From the 408th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00009
Honorable Linda A. Rodriguez, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Luz Elena D. Chapa, Justice
Beth Watkins, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: June 28, 2023

AFFIRMED

Appellant R.S. challenges the trial court's order terminating his parental rights to his children, B.R.S., A.M.S., M.R.S., N.J.S., M.A.S., and L.R.S.[1] On appeal, R.S. argues the evidence is legally and factually insufficient to support the trial court's finding termination is in the children's best interest. We affirm the trial court's order of termination.

## BACKGROUND

After concerns regarding exposure to domestic violence and drug use as well as medical neglect, the Texas Department of Family and Protective Services ("the Department") initiated emergency removal proceedings, seeking to remove six children—B.R.S. (age 9), A.M.S. (age 8),

---

[1] To protect the identity of the minor children in this appeal, we refer to the parent and children by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

M.R.S. (age 6), N.J.S. (age 3), M.A.S. (age 2), and L.R.S. (age 1)—from the care of R.S. and the children's mother A.N. In its petition, the Department sought temporary managing conservatorship of the children and termination of R.S. and A.N.'s parental rights. The trial court signed an emergency removal order, naming the Department temporary sole managing conservator of the children. The Department removed the children and placed them in two separate homes with family members. It also created a service plan for the parents, specifically requiring R.S. to provide proof of a stable home and employment, complete a drug assessment and psychological evaluation, attend individual counseling, and complete domestic violence classes. Following an adversarial hearing, the trial court ordered the parents to comply with the Department's service plan requirements. However, over the course of almost a year, neither parent engaged in services, and the Department elected to pursue termination of their parental rights. By this time, the Department had placed five of the children with their maternal aunt and the sixth child, L.R.S., with her maternal cousin due to L.R.S.'s medical needs.

The trial court held a one-day bench trial and heard testimony from two Department caseworkers, Carolina Coronado and Jennifer Galloway; the children's maternal aunt, Rosa Narvaez; the children's maternal cousin, Bianca Romero; and a CASA volunteer. The Department also admitted copies of the orders from the temporary and status hearings held in the case, R.S. and A.N.'s service plans, and documents from the Bureau of Vital Statistics regarding paternity for two of the children. After considering the evidence, the trial court entered an order terminating R.S.'s parental rights to the six children.[2] Specifically, the trial court terminated R.S.'s parental rights based on statutory grounds (D), (N), and (O) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D) (placing or allowing children to remain

---

[2] The order also terminated A.N.'s parental rights, and she did not appeal; she is therefore not a party to this appeal.

in conditions endangering their physical or emotional well-being), (N) (constructively abandoning the children), and (O) (failing to comply with court-ordered service plan). It further found termination is in the children's best interest. *See id*. § 161.001(b)(2). R.S. now appeals challenging the legal and factual sufficiency of the trial court's best interest finding.

## STANDARD OF REVIEW

A parent-child relationship may be terminated pursuant to section 161.001 of the Texas Family Code only if the Department proves by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and termination is in a child's best interest. *See id*. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. To determine if the heightened burden of proof was met, we employ a heightened standard of review by judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H*., 89 S.W.3d 17, 25 (Tex. 2002); *see, e.g.*, *In re O.N.H*., 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). This heightened standard protects the constitutional interests implicated by termination and retains the deference we must have for the factfinder's role. *O.N.H.*, 401 S.W.3d at 683.

When reviewing the sufficiency of the evidence, we apply well-established standards of review set forth in *In re J.F.C*., 96 S.W.3d 256, 266–67 (Tex. 2002) and reiterated in *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the legal sufficiency of the evidence, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.O.A*., 283 S.W.3d at 344 (quoting *J.F.C*., 96 S.W.3d at 266) (internal quotation marks omitted). We assume "the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have

been incredible." *Id*. (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). However, we do not disregard undisputed evidence even if it does not support the trial court's finding because it could skew our analysis in determining whether evidence rises to the level of clear and convincing evidence. *Id*. (citing *J.F.C.*, 96 S.W.3d at 266). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *J.F.C.*, 96 S.W.3d at 266) (internal quotation marks omitted). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *See id*. at 346; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## BEST INTEREST

### *Applicable Law*

When considering the best interest of the child, there is a strong presumption the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We further presume the prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE § 263.307(a). In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[3] *See id*. We also consider the non-

---

[3] These factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child or the child's parents; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability

exhaustive factors promulgated by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[4] These factors are known as the *Holley* factors. *See id.* The absence of evidence of some of these factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if undisputed evidence shows the parental relationship endangered the child's safety. *C.H.*, 89 S.W.3d at 27. However, in cases involving complex facts, a paltry record does not suffice. *Id.* Additionally, evidence proving any of the statutory grounds for termination may be probative on the issue of best interest, but it does not relieve the Department of its burden to prove best interest. *Id.* at 28.

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.— San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.* Finally, in conducting our review of a trial court's best interest determination, we focus on whether termination is in the child's best interest, not the parent's best interest. *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.).

### *Application*

The trial court first heard testimony from Department caseworker Coronado, who was the first caseworker assigned to the case and involved with the family when the children were removed from the home. She testified she had concerns regarding illegal drug use in the home, domestic

---

of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system is available to the child. *See id.*

[4] These factors are (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.*

violence between R.S. and A.N., and medical neglect of the children, which prompted the Department's involvement in this case. During its investigation, the Department learned L.R.S., who was under a year old at that time, had tested positive for "THC" when she was prematurely born the previous year, and as a result, she had developmental delays. Coronado testified the Department attempted to work with R.S. and A.N., but due to the parents' unwillingness to comply with the Department's recommendations, the Department proceeded with emergency removal proceedings.

"A factfinder can give 'great weight' to evidence of a parent's drug use, which supports a finding that termination is in the children's best interest." *In re T.N.J.J.*, No. 04-19-00228-CV, 2019 WL 6333470, at *5 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.). Moreover, illegal drug use exposes children to the possibility of a parent being impaired or imprisoned and is relevant to determining whether a parent can provide his children with stability and consistency. *Id*. Here, the trial court heard testimony from both Department caseworkers expressing concern regarding the children's access to illegal drugs in the home and R.S.'s drug addiction. Coronado testified R.S.'s drug use posed an immediate danger to the health and safety of the children, and Gallegos confirmed R.S. had "personal challenges . . . fighting a drug addiction." Both caseworkers also testified drug treatment would be appropriate for R.S., however, R.S. refused to attend inpatient drug treatment. According to Gallegos, R.S. "said that he would not go into inpatient with Lifetime because he didn't feel that it would be appropriate since he wouldn't be able to attend court." Based on this evidence, the trial court could have reasonably determined R.S. showed an unwillingness to engage in drug treatment and address his drug addiction, and such unwillingness to effect positive environmental and personal changes is pertinent to a best interest finding. *See In re K.M.L.H.*, No. 04-13-00779-CV, 2014 WL 1243080, at *5 (Tex. App.—San Antonio Mar. 26, 2014, no pet.) (mem. op.) (explaining trial court could have considered testimony

describing parent as unwilling to participate in services in best interest analysis); *see also* TEX. FAM. CODE § 263.307(b) (parent's unwillingness and ability to effect positive changes).

The trial court also heard testimony indicating the children were exposed to episodes of domestic violence between A.N. and R.S. "Evidence of the parents' history of domestic violence supports the trial court's best interests finding." *In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at *7 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.). "A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being." *Id.* (quoting *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *6 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.)) (internal quotation marks omitted). Here, Department caseworker Coronado testified the children had "experienced a lot of trauma" and were "very sad most of the time." Department caseworker Gallegos also testified the children "talked about the domestic violence between their mom and dad [and] about what they've seen." She further added R.S. denied the existence of domestic violence between him and A.N., and he did not understand the reason he needed to complete domestic violence classes. The CASA volunteer confirmed R.S.'s refusal to complete classes, and he testified R.S. told him "he didn't feel comfortable" taking the classes without further explanation. Accordingly, the trial court could have reasonably determined R.S.'s refusal to address the Department's concern regarding domestic violence endangered the children's well-being and showed R.S.'s continued unwillingness to effect positive changes for his children. *See id*.

The evidence also shows R.S. did not complete his service plan. *See In re S.A.M.*, No. 04-18-00607-CV, 2019 WL 573469, at *6 (Tex. App.—San Antonio Feb. 13, 2019, pet. denied) (mem. op., not designated for publication) (explaining parent's performance under service plan is relevant to several *Holley* factors and statutory factors set out in section 262.307(b)). Department caseworker Coronado testified when the Department became involved with the family, it tried to

keep the children in the home while working on a service plan with R.S., but "[t]here was no compliance, zero compliance." As a result, the Department initiated emergency removal proceedings, and the trial court entered a court-ordered service plan. She testified she reviewed the service plan with R.S., provided him a physical copy of the plan, and believed he understood the plan's requirements. She described his compliance as "minimal" and explained he "attempted to engage in some services," such as visitations, but he was not consistent. She testified when she asked R.S. why he was not engaging in services, he did not give her any viable reason. She further elaborated he was not "mentally prepared to do the services" because he could not find reliable transportation and was battling a drug addiction. The CASA volunteer reiterated R.S.'s unwillingness to engage in services, and he stated he believed R.S. was being dishonest about his transportation issues "because some of those services were on video, and . . . I'm not sure where the transportation came in." According to the CASA volunteer, he spoke to R.S., and he did not see any interest from him in trying to make efforts and comply with the service plan. Department caseworker Galloway echoed Coronado's and the CASA volunteer's testimony regarding R.S.'s noncompliance. She testified she explained to him the importance of completing the service plan, but he refused to admit himself into an inpatient drug treatment program or attend domestic violence classes because he believed he did not need to address this behavior. The trial court could have therefore reasonably concluded R.S. did not comply with his service plan, and his noncompliance supported a best interest finding. *See id*.

The Department also presented evidence the children were doing well in their separate placements. *See In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *4 (Tex. App.—San Antonio Nov. 25, 2020, no pet.) (mem. op.) (taking into account evidence showing children were thriving in foster placement in best interest analysis); *In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *6 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.) (considering

evidence children were doing well in separate foster placements in best interest analysis); *see also C.H.*, 89 S.W.3d at 28 ("Evidence about placement plans and adoption are, of course, relevant to best interest."). Department caseworker Coronado testified the placements were meeting the children's physical and emotional needs by providing stable and supportive households. Specifically, she testified, "The children with both placements have created an amazing bond. They've thrived so much. They're flourishing with their placements." Coronado further testified several of the older children expressed to her and their therapist their desire to stay permanently in their current placement. *See In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9–10 (Tex. App.—San Antonio Oct. 14, 2014, no pet.) (mem. op.) (discussing children's desire to stay with foster family when analyzing *Holley* factors). According to Coronado, "they [are] able to flourish with a stable environment. So they're doing a lot better than they were at the beginning of the case, and they're very happy where they're at." Department caseworker Galloway also added the children told her their foster home "feels stable," and they are consistently attending school and going to the doctor.

The trial court also heard testimony from Narvaez and Romero, the children's current caregivers. Narvaez testified the five children under her care were progressing. She testified when the Department placed N.J.S. in her care, he was three years old and did not speak very much, but over time, he started speaking. She further testified M.A.S. receives occupational therapy and sees an eye specialist, and B.R.S. is excelling in school after they initially thought she had dyslexia. Narvaez also testified each of the children are bright, and they speak openly with her and their therapist, who visits them once a month. Narvaez testified she plans to adopt the children, and she does not foresee any barriers in providing a permanent and safe home for the children. When asked whether the five children were aware they had a younger sibling, L.R.S., Narvaez testified the children visit L.R.S. once a month to maintain their relationship with her. She further added

they see L.R.S. at family gatherings. Department caseworker Galloway further confirmed Narvaez planned to keep the children in contact with L.R.S. Regarding L.R.S.'s care, Romero testified L.R.S. was doing well in her care; she described L.R.S. as an active and happy baby. According to Romero, L.R.S. was "very sick in the beginning" and had a lung disease as well as three holes in her heart. She testified L.R.S. was initially on oxygen, but she is currently off oxygen and learning how to walk. Romero further expressed her desire to adopt L.R.S. and provide her with a permanent residence and forever family. Accordingly, based on this evidence, the trial court could have reasonably concluded the children's best interest would be served by remaining in their foster placements.

When viewing the evidence under the appropriate standards of review, we conclude the evidence was clear and convincing, and a reasonable factfinder could have formed a firm belief or conviction that termination of R.S.'s parental rights is in the children's best interest. As the sole judge of the weight and credibility of the witnesses and their testimony, the trial court could have determined R.S. could not provide a safe and stable home for the children and was unwilling to effect positive environmental and personal changes. It therefore could have concluded the children's best interest would be best served by remaining with their current placements, who planned to adopt them and provide them with permanency and stability. Although there is not evidence of every single *Holley* factor, we remain mindful "not every factor must be proved to find that termination is in the child's best interest." *In re P.G.D.*, No. 04-19-00896-CV, 2020 WL 2543310, at *2 (Tex. App.—San Antonio May 20, 2020, pet. denied) (mem. op.). Evidence of only one factor is sufficient for the trial court to form a reasonable belief or firm conviction termination is in the children's best interest, especially, when, as in this case, the undisputed evidence shows the parental relationship endangered the children's safety. *See C.H.*, 89 S.W.3d at 27.

R.S., however, contends the evidence shows he was making progress on his service plan by completing what he deemed the most important item on his service plan—visitation—and he maintained a strong bond with his children. The trial court could have reasonably disbelieved this evidence and found it incredible; it further could have believed the Department caseworkers' and CASA volunteer's testimony indicating R.S. refused to engage in drug treatment and complete domestic violence classes. *See J.O.A.*, 283 S.W.3d at 344. Thus, when looking at all the evidence in the light most favorable to the finding as well as in light of the entire record, we conclude the evidence is legally and factually sufficient to support the trial court's finding termination of R.S.'s parental rights is in the children's best interest. *See id*.

## CONCLUSION

We affirm the trial court's order terminating R.S.'s parental rights to B.R.S., A.M.S., M.R.S., N.J.S., M.A.S., and L.R.S.

Luz Elena D. Chapa, Justice